LILLIE M. CLIFTON ET AL V. R. W. KOONTZ ET AL.

No. A-6555. Decided June 24, 1959.
Rehearing Overruled July 29, 1959.
(325 S.W. 2d Series 684)

*Rogers, Eggers & Sherrill* and *Guy Rogers,* all of Wichita Falls, for petitioners.

*Woodruff & Woodruff* and *W. B. Woodruff, Jr.,* of Decatur, for respondents.

MR. JUSTICE SMITH delivered the opinion of the Court.

This suit brought by petitioners, Lillie M. Clifton, individually and as executrix of the estate of her husband, J. H. Clifton, deceased, et al., seeks the cancellation of an oil, gas, and mineral lease on the theory that after the expiration of its ten-year primary term, the lease terminated due to cessation of production.

In the alternative, and only in the event the Court should find that production had not ceased, petitioners sought cancellation of the lease (other than for 40 acres around the existing well) on the theory that the owners of the lease (the working interest) breached an implied covenant to reasonably develop the property and to "reasonably explore the same for the production of minerals therefrom * * * ." It was their contention that the owners of the working interest, in the event of the alternative plea should be sustained, would forfeit all rights under the lease (except as to 40 acres around the producing well) upon failure within a reasonable time, to commence and continue the drilling of wells to a depth sufficient to test all known horizons in the general area. Petitioners also sought damages because of breaches of express and implied covenants of the lease.

The lease was executed in 1940. It covers two tracts of land encompassing 350 acres owned by the Cliftons, in Wise County, Texas. In 1949, during the primary term, a well was drilled which produced both oil and gas but very little oil. The Railroad Commission classified the well as an "associated" (with oil) gas well. Other than its acidization in 1950, no other drilling or reworking operations were carried on during the intervening years until September 12, 1956, when it was successfully reworked by "sandfracting." This date was subsequent to the filing of the present case.

The judgment of the trial court, entered after a trial before the court, without the aid of a jury, contains the court's find-

ings of fact upon the basic questions. The courts found that the existing gas well had at all material times continuously produced gas in paying quantities. Accordingly, the oil and gas lease was held to be in full force and effect, thus denying petitioners' prayer for judgment that the lease had terminated. The judgment recites a finding to the effect that petitioners were damaged by the failure of respondents to rework the existing well and to drill, but that such damages were speculative and could not be ascertained with any degree of certainty. Judgment for damages was therefore denied.

The judgment decreed "that unless on or before the expiration of 60 days after the date this Judgment shall become final, the owners of the working interest shall commence and thereafter drill with reasonable diligence and in a good and workmanlike manner a test well looking to the production of oil and/or gas on said land, the drill site to be selected by said working-interest owners and said well to be drilled to a total depth of 5600 feet below the surface of said land unless production of oil and/or gas in paying quantities be by them found at a lesser depth, this lease shall terminate and re-invest in Plaintiff and her assigns except as to the conglomerate formation found in the stratigraphic interval from 5300 to 5600 feet, from which the present well is now producing, such section being generally known as the Atoka [Morris Field] conglomerate; and as to all of such section, strata, or formation the lease shall continue in full force and effect, as to appearing parties herein, so long as it continues producing oil, gas or other minerals conformably with the terms of the lease instrument."

Both petitioners and respondents appealed. The Court of Civil Appeals affirmed the trial court's judgment denying termination of the oil and gas lease and petitioners claim for damages, but held that respondents were not required to drill a second well. Therefore, the judgment of the trial court requiring such drilling was reversed and rendered. 305 S.W. 2d 782.

We have concluded that the judgment of the Court of Civil Appeals must be sustained. We first consider the primary question, which is: Was there any evidence to sustain the finding of the trial court that production in paying quantities had not ceased?

1 One of the rules in determining this question is the well settled rule that if there is any evidence reasonably tending to prove, either directly or by permissive inference, the essential

facts, the judgment rendered thereon must be sustained. Woodward v. Ortiz, 150 Texas 75, 237 S.W. 2d 286; Benoit v. Wilson, 150 Texas 273, 239 S.W. 2d 792.

We have examined the entire record and in doing so have viewed the evidence in the light most favorable to the respondents; discarding all adverse evidence, and giving credit to all evidence favorable to the findings and judgment of the court, the trier of the facts, and have reached the conclusion that there is evidence of probative force supporting the judgment of the trial court that the gas well had continuously produced in paying quantities.

Petitioners base their contention that the well had ceased to produce in paying quantities upon the showing that for the period of time from June 1955 through September 1956, the income from the lease was $3,250.00 and that the total expense of operations during the same period was $3,466.16 — thus, a loss of $216.16 for the sixteen months' period selected by petitioners. During the period of time indicated, some months showed a gain and some a loss. For the months of July, August, and September 1956, the total net loss amounted to $372.37. These were the months immediately following June 1956, the date respondent, Koontz, acquired his 52 per cent interest in the lease. Beginning July 1, 1956 he began making financial arrangements, securing the services of third parties, and commenced saving all oil produced from the lease to be used in reworking the well. The holding from the market of this oil accounts materially for the losses in the operations during the months of July, August, and September 1956. The record shows that for years, in view of the low allowable on gas, the oil production had made the difference between operating at a profit and at a loss. The respondent, Koontz, testified that from two to three months were required to accumulate a tank of oil and that after such accumulation a sale would be made. Respondents' evidence reflects that through 1955 and 1956 there was but little variation in gas production. For the same period of time there was a great variation in oil production, resulting in a showing of a profit in months when oil sales were made.

**2** It is undisputed that reworking operations were commenced on September 12, 1956, and that such operations resulted in an 1800 per cent increase of production. Reworking operations having thus been commenced on September 12, 1956, the evidence that there was a small operating loss for the period of time from July 1956 through September 1956 is not controlling

in determining whether or not there had been a cessation of production in paying quantities through July 12, 1956, a date 60 days prior to the beginning of reworking operations. The question, therefore, is: Was there production in paying quantities from the existing well through July 12, 1956? Evidence, as contended for by the petitioners, as to profit or loss subsequent to July 12, 1956, is immaterial in determining whether or not there was production in paying quantities through that date. If there was production in paying quantities at all times through July 12, 1956, then the clause contained in the lease, which permits reworking within 60 days following cessation of production, if it ever came into operation, was complied with when reworking operations were begun on September 12, 1956, and later successfully completed. Thus, by considering only the evidence relative to production prior to July 12, 1956, we find that the lessee operated at a profit in the sum of $111.25, for the period of time beginning in June 1955 and continuing through July 12, 1956. The record shows a loss during the months of April and May 1956. The record further shows that for the year 1954, a profit was earned each month, and that the aggregate profit was the sum of $1575.00; that in 1955 the operations were profitable during nine months of the year, with a net profit of $894.00 for the year; and that for the first six months' period of 1956, the lease was operated at a profit of $145.00. These factual situations, when considered in the light most favorable to the findings of the trial court, support its finding and judgment that there was not a cessation of production in paying quantities through July 12, 1956.

Petitioners argue that it is settled under the Texas law that, after the primary term, the ordinary oil and gas lease absolutely terminates when its income no longer exceeds the cost of its operation, and that since the operations showed a loss for the months of April and May 1956, the lease terminated. Citing Garcia v. King, 139 Texas 578, 164 S.W. 2d 509, and Holchak v. Clark, Texas Civ. App., 284 S.W. 2d 399, er. ref. Also Freeman v. Magnolia Petroleum Company, 141 Texas 274, 171 S.W. 2d 339; Cox v. Miller, Texas Civ. App., 184 S.W. 2d 323, er. ref. The further argument is made that such established rule applies as well to a lease with a 60-day termination clause, except a period of 60 additional days is allowed in which to begin additional drilling or reworking operations. The lease under consideration does contain such a clause which is directly related to the petitioners' argument relating to the determination of cessation of production:

"* * * or if after discovery of oil, gas or other mineral the production thereof should cease from any cause, this lease shall not terminate if lessee commences additional drilling or re-working operations within sixty (60) days thereafter * * *."

We agree with petitioners that if production in paying quansities ceased, the 60-day clause applies. However, the facts in the instant case compel a different result than that contended for by petitioners.

**3** It is only in the event of a finding of cessation of production in paying quantities that the trial court would be called upon to determine whether, if within 60 days from the date of such cessation, reworking operations were begun and resulted in profitable production thereafter. After cessation of production in paying quantities, the lessee has 60 days of "grace" in which to save his leasehold, however, if production never ceased, as is the case here, the 60-day clause is not definitive of the period over which the trier of the facts must determine whether a lease is producing in paying quantities. There can be no arbitrary period for determining the question of whether or not a lease has terminated for the additional reason that there are various causes for slowing up of production, or a temporary cessation of production, which the courts have held to be justifiable. See Texas Pacific Coal & Oil Co. v. Bratton, Texas Civ. App., 239 S.W. 688 (1921), no writ history; also Midwest Oil Corp. v. Winsauer, 159 Texas 560, 328 S.W. 2d 944. We again emphasize that there can be no limit as to time, whether it be days, weeks, or months, to be taken into consideration in determining the question of whether paying production from the lease has ceased. To apply the 60-day clause as contended by petitioners would mean that the respondents would have been required to immediately commence drilling operations, upon sustaining a slight loss for one month, without regard to whether they believed the next month's production might be profitable for the reason that if they were in error and suffered another slight loss, the lease would terminate. The petitioners cite the case of Stanolind Oil & Gas Company v. Newman Brothers Drilling Company, 157 Texas 489, 305 S.W. 2d 169, as supporting their position. That case has no application to this question since it was concerned primarily with whether the 60-day clause and the 30-day clause contained in an oil, gas or mineral lease are cumulative in application or separate and distinct provisions. No attempt was made in that case to settle the question of over what period of time paying quantities should be determined. However, the opinion does state that "the sixty-day pro-

vision would be brought into play by a cessation of such production."

4 The lease instrument involved in this suit provides by its terms that it shall continue in effect after commencement of production, "as long thereafter as oil, gas, or other mineral is produced from said land." While the lease does not expressly use the term "paying quantities," it is well settled that the terms "produced" and "produced in paying quantities" mean substantially the same thing. Garcia v. King, 139 Texas 578, 164 S.W. 2d 509.

The generally accepted definition of "production in paying quantities" is stated in the Garcia case, supra, to be as follows:

"If a well pays a profit, even small over operating expenses, it produces in paying quantities, though it may never repay its costs, and the enterprise as a whole may prove unprofitable."

In the case of a marginal well, such as we have here, the standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.

In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matter which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his product, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes.

5 The term paying quantities involves not only the amount of production, but also the ability to market the product (gas) at a profit. See Benedum-Trees Oil Co. v. Davis, 107 F. 2d 981 and Hanks v. Magnolia Petroleum Co., (Texas Com. App.) 24 S.W. 2d 5. Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant the use of the gas in the market, and the income therefrom is in excess of the actual marketing cost, and operating costs, the production satisfies the term "in paying

quantities." In the Hanks case, supra, the trial court found that the well completed by Hanks did not produce in paying quantities within the contemplation of the terms of the lease, and this Court upheld such finding, holding that there was no evidence showing that there were any facilities for marketing the gas or any near-by localities or industries which might have furnished a profitable market therefor. The Court went further and pointed out the complete failure of the evidence to show what the gas could have been sold for at any probable market, and that there was no evidence "tending to show that the well was situated in such proximity to any prospective market which would justify the construction of a pipe line for marketing the same."

In the present case we have a finding of the trial court that there was production in paying quantities, and that the lease had not terminated. The evidence supports the finding. Evidence of marketing facilities and that the gas was sold at a profit is present in the instant case, whereas the Hanks case, supra, was wholly devoid of such evidence.

6 Proration rules adopted by the Texas Railroad Commission are a factor in determining the productive capacity of a particular lease. The Railroad Commission may by its order, for example, permit the taking of a greater percentage of the daily volume from nonassociated gas wells to the end that adequate quantities of gas may be delivered during the winter months when the demand therefor is the greatest, and by its order reduce the percentage to be taken during the summer months when a much less quantity of gas is needed. Relative to individual lease or gas units, the Commission has taken the position that it may by its order allow an overproduction for a period of time to meet the market demand for that period, and, in order to balance such overproduction, it takes the position that it may order that the well be cut down to a minimum volume of production.

7 Petitioners contend that the trial court's finding that production in paying quantities had not ceased is erroneous because the profit and loss figures heretofore considered do not include charges for depreciation as an operating expense. We are of the opinion that the trial court correctly excluded depreciation as an operating expense in determining whether and when production in paying quantities ceases. The petitioners contend that depreciation of the original investment cost should be taken into consideration as a part of the expense in operating

the well. With this contention we do not agree. We do not have before us the question of whether or not depreciation on producing equipment should be charged as an operating expense, and, therefore, do not decide the question.

As the Garcia case, supra, indicates, the term "paying quantities," when used in the extension clause of an oil lease habendum clause, means production in quantities sufficient to yield a return in excess of operating costs, and marketing cost, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. The underlying reason for this definition appears to be that when a lessee is making a profit over the actual cash he must expend to produce the lease, he is entitled to continue operating in order to recover the expense of drilling and equipping, although he may never make a profit on the over-all operation. Depreciation is nothing more than an accounting charge of money spent in purchasing tangible property, and if the investment itself is not to be considered, as is held by this Court, then neither is depreciation.

In Transport Oil Co. v. Exeter Oil Co. Ltd., 84 Cal. App. 2d 616, 191 P. 2d 129, it was held that operation of an oil and gas leasehold at an annual profit of about $4,300.00, without deduction of reserves for depletion and depreciation and after exclusion under terms of the lease and operating agreement of overriding royalties as an operating expense, was in "paying quantities" within the habendum clause of the lease. By not including depreciation as an operating expense, we more nearly accomplish a just result for lessors and lessees alike, for, if the rule were otherwise, many leases would be terminated and the lessees' incentive to drill decreased, regardless of the magnitude of the investment.

Petitioners present two cases to support their argument that depreciation should be treated as an expense item, but they are both distinguishable. In Persky v. First State Bank, Texas Civ. App., 117 S.W. 2d 861, no writ history, the Court of Civil Appeals merely held:

"We *might* take judicial knowledge that all property of this kind has some depreciation from year to year, but we could not, in the absence of testimony to support it, take judicial knowledge of the percentage or amount of such depreciation." (Emphasis supplied.)

It is not held that depreciation is to be considered as operation expense, and, as such, is to be deducted from income. Also, we do not have pumping machinery involved in the case at bar, as was true in the Persky case.

The other case relied upon is United Central Oil Corporation v. Helm, 11 F. 2d 760 (5 cir.), certiorari denied, 271 U.S. 686, 70 L. Ed. 1151, 46 S. Ct. 638. The Court in that case held that depreciation and overhead expenses are to be considered in determining paying quantities at the time of abandonment of a lease, in an action for damages against the lessee by the lessor. However, the lease was for a period of four years rather than "so long thereafter as oil and/or gas are produced." The holding in the Helm case does not conflict with our holding in the present case. The case merely demonstrates the variable meaning applied to the phrase "paying quantities."

**8** Petitioners contend that the 8 per cent overriding royalties outstanding, as shown by the record, should be excluded from the total income attributable to the working interest in determining whether or not production is being obtained in paying quantities. We do not agree. The entire income attributable to the contractual working interest created by the original lease is to be considered. Petitioners cite no Texas case, and we have found none, which supports their argument. While apparently there is no Texas decision in point on the particular question, we believe the case of Transport Oil Co. v. Exeter Oil Co. Ltd., supra, is authority supporting our view. In that case the basic oil and gas lease on a tract of land executed in 1921 required certain drilling operations and the payment of 16-2/3rds per cent royalty to the lessor based upon the gross income. After several assignments of the lease in which overriding royalties had been reserved, the plaintiff in the action became the owner of the lease subject to the overriding royalty. Thereafter, the plaintiff, Transport Oil Company, assigned this lease to the defendant, Exeter Oil Company, in which assignment the defendant obligated itself to pay out of the gross income from the lease, the basic landowner's royalty, the overriding royalty reserved in previous assignments, and the override to the plaintiff totaling almost 50 per cent of the income per well. In 1942 the defendant plugged the well and abandoned the property, due to declining production. The abandonment terminated the plaintiff's interest as an overriding royalty owner, and it brought suit to recover damages. The court held that overriding royalty could not be excluded from the total income in determining whether there

was production in paying quantities. See also, Vance v. Hurley, 215 La. 805, 41 So. 2d 724 (1949).

We come now to consider the question of whether the petitioners are entitled to a cancellation of the lease (other than for 40 acres around the existing well) on the theory advanced by the petitioners that the owners of the lease (the working interest) breached an implied covenant to reasonably develop the property and to "reasonably explore the same for the production of minerals therefrom * * * ." The petitioners take the position that the implied covenant to further develop the property required and obligated the working-interest owners to rework the existing well.

The findings of fact incorporated in the trial court's judgment, bearing directly upon this question, are as follows:

"1. That the working interest owners likewise impliedly covenanted and were obligated to develop the lease and to further explore said land for other such reservoirs and formations which might be so productive, in both instances in the manner and with the diligence of a reasonably prudent operator under all the surrounding facts and circumstances;

"2. That the implied covenant first above stated [to reasonably develop] required and obligated the working interest owners to rework the existing well two years before they actually did so in September, 1956;

"3. That the implied covenant second above stated [to further explore] required and obligated said working interest owners to drill a second or additional well on said land as a test well looking to the production [of] oil, gas or other minerals therefrom prior to this date;

"4. That said working interest owners have violated both said implied covenants by failing so to rework the existing well and drill the second well within the times respectively specified therefor;"

The courts generally have recognized the implied covenant to reasonably develop the premises after production is obtained. Such implied covenant requires a lessee, after production is discovered on the premises, to conduct further development with reasonable diligence, to the end that such operations would result in a benefit or profit for both the lessor and the lessee. The

petitioners first sought damages for the breach of the implied covenant to reasonably develop by failing to rework the existing well. Their pleadings were sufficient to admit proof that the owners of the working interest had violated such implied covenant to further develop the leased premises. The pleadings were that the owners of the working interest, had full knowledge that the existing gas well had ceased to produce in paying quantities, and that the lease had terminated because of such cessation of production; that Koontz "belatedly began the reworking of well Number 1, and as a result of its reworking, production of oil and * * * gas was increased manifold, which reworking should have been done at least three years prior to the filing of this suit on August 11, 1956, and, had it been done, the parties at interest would have received royalties, in addition to what they did receive, in excess of the amount herein elsewhere alleged."

Admitting that respondents failed to rework the existing well for two years before it was actually reworked on September 12, 1956, and that the petitioners sustained damages because of such failure, we cannot agree with petitioners' contention that the evidence showing an increase in production and income after the reworking of the well would support a judgment for damages. The trial court held that such damages were too "speculative to be ascertained with any degree of certainty." The evidence supports such a finding. Respondents contend that the judgment as contained in the transcript omits the phrase "and that such damages have not been proved with any degree of certainty." Petitioners contend that had the well been reworked, two years before reworking was actually begun, they would have received monthly royalty in the sum of $270.00, and that such payments would have been continuous for the 2-year period. They contend that the failure to earlier rework the existing well amounted to a breach of the covenant to reasonably develop the premises. With this contention we cannot agree. There is no evidence in this record that the petitioners will not recover all of their undivided interest in the gas reservoir under the land involved; neither is there any evidence that earlier reworking of the existing well would have resulted in the production of any greater quantity of gas. It is entirely speculative and uncertain as to the life of the field. The record does not disclose any factual or evidentiary basis upon which damages can be assessed with certainty.

Petitioners next contend that the respondents breached the implied covenant to reasonably develop by failing to drill addi-

tional wells for the purpose of developing all formations for the production of oil and/or gas, and that the evidence supports such contention. With this we cannot agree. Charles Kadane, one of the petitioners, testified that he was willing to take a chance and drill a well on the Clifton lease. His decision to enter into a contract to drill on the Clifton lease was reached after he had drilled the "Sipes" well. This well was located about 1200 feet north of the north line of the Clifton 350-acre tract involved in this suit. Mr. Kadane testified that the showing of oil in the Sipes well was in the Strawn formation, that the test was successful, but that at the time of the trial he was not producing anything from the Strawn formation. However, he testified that he anticipated "producing at some later date should the lower production run out." He testified further that there were three different conglomerates below the Strawn formation, and that he tested the conglomerate in two places, making a total of three tests. The tests in the two conglomerates were made to a depth of approximately 5600 feet. Mr. Kadane testified that the Marble Falls and Ellenburger formations are both below 5600 feet, but that he did not test either of those formations. He stated that no wells had been drilled close to either of those formations, but that he thought there was a "likelihood" of production being obtained from those formations in the area of the Sipes and Clifton leases. The nearest well producing from such formations or sands was some 2½ miles east of the tract involved in this suit. The evidence fails to show that any tests were made on the 350-acre Clifton tract, and that production of oil or gas could be produced in paying quantities from either the Strawn formation, which is a stratum above the present production, or the Marble Falls and Ellenberger formations, which are strata below present production. There is no evidence in the record of any geological formation or horizon in the area of the 350-acre Clifton lease, other than the conglomerate, from which production is being obtained in paying quantities. Mr. Kadane's contract with Mrs. Clifton to drill a well, if cancellation of the present lease was obtained, was premised upon obtaining a release of acreage, and not upon a release of horizons under acreage.

9   The gas well now in production is located in the Morris Field. There is no evidence that reasonable development required that an additional well be drilled to this stratum to obtain production of either oil or gas. The field rules prescribed by the Railroad Commission were introduced in evidence. They were adopted by the Railroad Commission on February 28, 1955, and provide for 320-acre units with 10 per cent tolerance so that a maximum of 352 acres may be assigned. Consequently, on this particular

350-acre tract only one well could be permitted to be drilled to the Morris sand. Rule 3, as promulgated by the Railroad Commission for this field, provides that gas shall be allocated to each well in the ratio that the product of bottomhole pressure times acreage bears to the summation of this product for all wells in the reservoir. Thus, it is seen that if a second well had been drilled on the 350-acre lease to the Morris sand, then the total allowable for the two wells would have been no greater than the allowable for one.

We conclude from all of the above circumstances that the respondents did not violate the implied covenant to reasonably develop the lease by the drilling of additional wells. The petitioners did not discharge the burden which rested upon them to prove, as required, that the lessees failed to measure up to the standard of the prudent operator. While it is true that each separate stratum or horizon would be entitled to separate development, yet it is equally true that the burden rests upon the lessor to prove that the producing stratum required additional wells, or that strata different from that from which production is being obtained, in reasonable probability, exist, and that by the drilling of additional wells there would be a reasonable expectation of profit to the lessee. Under such circumstances, the lessee's obligation as to development is measured by the rule of reasonable diligence or what an ordinarily prudent and diligent operator would do, and he is not required to continue in the performance of these duties or to engage in the performance of these duties or to engage in the performance of such implied duties unless there is a reasonable expectation of profit, not only to the lessor, but also to the lessee. Texas Pacific Coal & Oil Co. v. Barker, 117 Texas 418, 6 S.W. 2d 1031, 60 A.L.R. 936; Brewster v. Lanyon Zinc Co., 140 Fed. 801 (8th Cir.) ; Rhoads Drilling Co. v. Allred, 123 Texas 229, 70 S.W. 2d 576.

This Court in the case of Texas Pacific Coal & Oil Co. v. Barker, supra, quoted with approval the holding in the case of Brewster v. Lanyon Zinc Co., supra, wherein the Court said:

"The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interests, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. It is only to the end that the

oil and gas shall be extracted with benefit or profit to both that reasonable diligence is required."

However, it should be noted that we do not have a factual situation where the lease covers several thousand acres and an effort is being made to hold such vast acreage by showing production from a comparatively small area. Neither are we confronted with a situation where an unreasonably long length of time has elapsed since the last development of the leased premises. Therefore, we do not pass upon these questions.

10 We turn now to the holding of the trial court that the working-interest owners impliedly covenanted to further explore the land for other reservoirs and formations, and that such implied covenant was violated, and that such violations obligated the respondents to drill a second or additional well. Petitioners contend that there is an implied covenant to explore as distinguished from the implied covenant to conduct additional development after production is once obtained. Petitioners argue that there is a distinction between development and exploration. They urge this Court to approve of the holding in the case of Willingham v. Bryson, Texas Civ. App., 294 S.W. 2d 421, no writ history, wherein an implied covenant of exploration as opposed to the implied covenant of development was adopted. We do not believe this case to be authoritative or in harmony with the rule announced in the Texas cases. Our examination of the Texas cases reveals that the corpus of the oil and gas law, as it has developed, treats the covenant of development as covering all additional drilling requirements after production is once obtained on the lease, except those for protection from offset wells which are draining the premises.

The issue in Willingham v. Bryson, supra, was whether there is an implied covenant to "explore" as distinguished from the covenant to "develop," and if there be such a covenant, what is the lessor's burden to show that he is entitled to further exploration or to a cancellation. The court held that there is an "implied covenant reasonably to explore a lease after production has been obtained" as distinguished from the covenant reasonably to develop. The court continues by stating that it is not necessary for the lessor to prove that additional drilling would probably result in profit, but that the prudent operator rule was satisfied by a showing that no well had been drilled to a deeper sand, "coupled with the testimony of one witness that he would be willing to drill another well."

The Court of Civil Appeals in the Willingham case, supra, cites the case of Sauder v. Mid-Continent Petroleum Corporation, 292 U.S. 272, 54 S. Ct. 671, 78 L. Ed. 1255, 93 A.L.R. 454, in support of its theory of the existence of a covenant to explore. However, the court in the Willingham case makes no reference to the clearly stated issue in the Sauder case at page 278 of the opinion.

"The question for decision is whether the respondent failed to comply with an implied covenant to develop the tract with reasonable diligence."

The court did not treat exploration as a separate covenant, but instead followed the basic theory in the case of Brewster v. Lanyon, supra. The latter case dealt solely with the development covenant. In addition, the court in the Sauder case, justifies its holding upon the peculiar circumstances surrounding the drilling on the disputed lease where drilling had been so long delayed.

11  We hold that there is no implied covenant to explore as distinguished from the implied covenant to conduct additional development after production in paying quantities has been obtained. Petitioners argue that the lease involved *expressly* provides for exploration. We agree that, under the terms of the lease, the lessee has the right to explore, but it does not necessarily follow that the lessee is under a duty to explore. To follow ptitioners' argument would be to adopt the theory advanced in their "Outline of Argument," filed in this Court, that "In an oil and gas lease, the implied covenant reasonably to explore obligates the lessee to drill when a ready, able and willing operator would drill regardless of the certainty of profit." In support of this theory the petitioners cite the case of Willingham v. Bryson, supra, and Meyers, "The Implied Covenant of Further Exploration," 34 Texas Law Rev. 553. This theory is untenable and is diametrically opposed to our established "prudent operator" rule where expectation of profit is an essential element. See Texas Pacific Coal & Oil Co. v. Barker, supra. We decline to follow the theory advanced that there is an implied covenant to explore as distinguished from the implied covenant to develop. There being no implied covenant to explore, the respondents were under no duty to drill a second or additional well, as found by the trial court.

The judgment of the Court of Civil Appeals is affirmed.

Associate Justice Hamilton not sitting.

Opinion delivered June 24, 1959.

Rehearing overruled July 29, 1959.