McDaniel, BW et al v. McKeown
















IN THE
TENTH COURT OF APPEALS
 

No. 10-97-003-CV

Â Â Â Â Â BILLY W. McDANIEL, ET AL.,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellants
Â Â Â Â Â v.

Â Â Â Â Â CHRISTOPHER E. McKEOWN,
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Appellee
 
Â 
From the 13th District Court
Navarro County, Texas
Trial Court # 96-00-06245-CV
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

O P I N I O N
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â 

Â Â Â Â Â Â We must decide whether a summary judgment terminating rights under a farmout agreement
and assignment was properly granted.
FACTS
Â Â Â Â Â Â On April 1, 1993, Wharton Oil Company and others (collectively called âWhartonâ) signed
a development agreement or âfarmoutâ agreement with Billy W. McDaniel, covering a 100-acre
tract in Navarro County on which Wharton held a lease. The agreement called for McDaniel to
drill a series of test wells and provided that he would âearnâ acreage under the leases as wells came
into production. McDaniel drilled and completed a well known as the McKie No. 1, and on May
1, 1993, under the farmout agreement, Wharton assigned the acreage to him, reserving an
8.53125% overriding royalty interest in all production from the Woodbine Sand.



Â Â Â Â Â Â Effective June 1, 1995, Wharton assigned its interest in the 100-acre lease to Christopher E.
McKeown. In September of that year, McKeown notified Quanico Oil & Gas, Inc., the operator
of the unit, that he felt that the well had been abandoned and that he had âexercised his option
under the farmout agreement to assume ownership and control of the well.â On February 16,
1996, McKeown sued Billy McDaniel and other parties who had interests in the unit (collectively
referred to as âMcDanielâ) to terminate the development agreement. Without any discovery, he
filed a motion for summary judgment, which the court granted. McDaniel asserts in three points
of error that the court acted improperly.
SUMMARY-JUDGMENT CONTENTIONS
Â Â Â Â Â Â McKeown's motion for summary judgment asserts: (1) he succeeded to all of Wharton's
interest in the 100 acres, including any reversionary interests that may have been created by the
farmout agreement or the assignment to McDaniel; (2) the assignment to McDaniel was subject to
the âconditionsâ of the farmout agreement; (3) the assignment to McDaniel was subject to the
âconditionsâ of the original lease, i.e., a lease from Blanche McKie and others to T. H. Westbrook
and Harry W. Smith, dated April 11, 1939; (4) certain provisions of the farmout agreement had
resulted in reversion of acreage to McKeown; (5) the McKie well ceased production in April 1994;
and (6) the unit had not been equipped to be capable of production for a period of two years.
Â Â Â Â Â Â As summary-judgment evidence, McKeown attached:
Â Â Â Â Â Â âÂ Â Â Â certified copies of the pertinent lease, assignments, and the farmout agreement;
Â Â Â Â Â Â âÂ Â Â Â certified copies of Railroad Commission production records showing monthly production
of oil and gas from the McKie unit from June of 1993 through March of 1996;
Â Â Â Â Â Â âÂ Â Â Â an affidavit of Richard Freeman, a fact witness to the lack of production; and 
Â Â Â Â Â Â âÂ Â Â Â an affidavit of the attorney who gave the notice of McKeown's taking over the unit.
Â Â Â Â Â Â McDaniel's response to the motion for summary judgment acknowledges the relative ownership
interests of the parties and points to the completion of the McKie unit that resulted in production
in April of 1994. As summary-judgment evidence, McDaniel filed an affidavit from Jerry D.
Alexander, the owner of Quanico Oil and Gas, Inc., which relates efforts by the operator of the
well to restore production and states that a permit had been issued by the Railroad Commission for
re-entry into the well for a workover.
STANDARDS OF REVIEW
Â Â Â Â Â Â First, we look to the well-established rules by which we review summary judgments:
Â Â Â Â Â Â (1)Â Â The movant for summary judgment has the burden of showing that there is no genuine
issue of material fact and that the movant is entitled to judgment as a matter of law. 
Â 
Â Â Â Â Â Â (2)Â Â In deciding whether there is a disputed material fact issue precluding summary judgment,
evidence favorable to the non-movant will be taken as true. 
Â 
Â Â Â Â Â Â (3)Â Â Every reasonable inference must be indulged in favor of the non-movant and any doubts
resolved in his favor. 
Â 
Nixon v. Mr. Property Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex. 1985). To prevail on a motion
for summary judgment, a plaintiff must conclusively prove all elements of its cause of action as a
matter of law. Westland Oil Dev. Corp. v. Gulf Oil Corp., 637 S.W.2d 903, 907 (Tex. 1982);
Tex. R. Civ. P. 166a(c).Â 
Â Â Â Â Â Â Under the rules relating to the interpretation of contacts, if a written instrument is so worded
that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous
and the court will construe the contract as a matter of law. Coker v. Coker, 650 S.W.2d 391, 393
(Tex. 1983). Language should be given its plain grammatical meaning unless it definitely appears
that the intention of the parties would be thereby defeated. Reilly v. Rangers Mgmt., Inc., 727
S.W.2d 527, 529 (Tex. 1987). In arriving at the meaning of its language, an unambiguous
instrument should be considered from its "four corners." French v. Chevron U.S.A., Inc., 896
S.W.2d 795, 797 (Tex. 1995). Courts will avoid when possible a construction which is
unreasonable, inequitable, and oppressive. Reilly, 727 S.W.2d at 529; Hicks v. Smith, 330
S.W.2d 641, 646 (Tex. Civ. App.âFort Worth 1959, writ ref'd n.r.e.). With these principles in
mind, we will review the summary judgment.
REVIEW
Â Â Â Â Â Â McDaniel's three points of error contend that the court should not have granted summary
judgment because: (1) the farmout agreement was not subject to termination as to acreage that had
been âearnedâ by production from the McKie unit; (2) the provisions of the farmout agreement
should be construed as âcovenantsâ rather than âconditions of divestitureâ; and (3) the summary-judgment evidence shows that material fact issues exist, requiring a trial.
Â Â Â Â Â Â The facts surrounding the leases, the farmout agreement, and the assignments are not in
dispute. The quarrel between the parties is the legal effect of those facts, calling for an
interpretation of the agreements, and whether the evidence conclusively shows that the unit had
been in a non-productive status such as to justify termination of McDaniel's interest.
Â Â Â Â Â Â At the outset, we observe that McKeown attempts to support the summary judgment on the
basis that McDaniel âabandonedâ the unit. Abandonment of title to real property is not recognized
in Texas. Rogers v. Ricane Enter., Inc., 772 S.W.2d 76, 80 (Tex. 1989). Thus, title to real
property interests acquired under an oil and gas lease may not be abandoned. Id. (summary
judgment may not be sustained on theory that the defendants abandoned a working interest acquired
under a partial assignment of a base lease).
Â Â Â Â Â Â McDaniel's third point urges us to find fact issues in the competing summary-judgment
evidence. He says that Alexander's affidavit creates a fact issue about abandonment. As we have
noted, abandonment as a legal theory is immaterial. See id. The proper inquiry is whether there
is a fact issue about the continuation of production from the well and the consequences of non-production. Alexander says that Quanico acquired Billy McDaniel's interest in June of 1996. He
essentially relates the activities that had taken place prior to that date, mostly during 1994, to
rehabilitate the well. He also states that since December 1995 Quanico had held a permit to reenter
the well. McKeown points out that the affidavit âdemonstrates the entire lack of activity on the
lease for more than two years.â Our review of the summary-judgment evidence reveals that it
conclusively shows that production ceased in May 1994. Triton Oil & Gas Corp. v. Marine
Contractors & Supply, Inc., 644 S.W.2d 443, 446 (Tex. 1982) (A matter is conclusively
established if ordinary minds could not differ about the conclusion to be drawn from the evidence.);
see also G.H. Bass & Co. v. Dalsan Properties-Abilene, 885 S.W.2d 572, 576 (Tex. App.âDallas
1994, no writ).
Â Â Â Â Â Â McDaniel's second point urges us to find that the terms of the farmout agreement under
consideration were âcovenantsâ rather than âconditions of divestiture.â McKeown, on the other
hand, says that the written instruments show that the continuation of McDaniel's interest in the
property was conditioned and predicated upon continued production from the well.
Â Â Â Â Â Â An important distinction exists between a condition and a covenant. Rogers, 772 S.W.2d at
79. That distinction lies in the appropriate remedy for their breach. Id. Breach of a condition
results in automatic termination of the leasehold upon the happening of the stipulated event,
whereas breach of a covenant does not; breach of a covenant subjects the breaching party to
damages or, in extraordinary circumstances, a conditional decree of cancellation. Id. (citing W.T.
Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W.2d 27, 29-31 (1929)). Two supporting
rules of contract and leasehold construction are: courts should not, under the guise of contract
construction, imply terms in opposition to the express language that the parties themselves have
written into the contracts; doubts should be resolved in favor of a covenant instead of a condition. 
Id.
Â Â Â Â Â Â An oil and gas lease automatically terminates upon permanent cessation of production after
expiration of the primary term. Amoco Prod. Co. v. Braslau, 561 S.W.2d 805, 808 (Tex. 1978).
A total cessation of production for the number of consecutive days provided in a lease automatically
terminates the lease. Exploration Co. v. Vega Oil & Gas Co., 843 S.W.2d 123, 125 (Tex.
App.âHouston [14th Dist.] 1992, writ denied). A lease may provide for continuation as long as
production in paying quantities continues. Whether production is in paying quantities is determined
by ascertaining whether under all relevant circumstances, a reasonably prudent operator would
continue to operate a well in the manner in which it is being operated for the purpose of making
a profit and not merely for speculation. Clifton v. Koontz, 160 Tex. 82, 325 S.W.2d 684, 691
(1959); Ballanfonte v. Kimbell, 373 S.W.2d 119, 120 (Tex. Civ. App.âFort Worth 1963, writ
ref'd n.r.e.).
Â Â Â Â Â Â We find that the assignment made by Wharton to McDaniel after the well was completed
explicitly makes McDaniel's interest subject to the terms, covenants, and conditions of the original
1939 lease. Neither the lease, the farmout agreement, nor the assignment to McDaniel specifies
a number of days after which non-production will terminate an interest. What the lease does
provide is that it continues in existence as long as production continues in paying quantities. The
summary-judgment evidence does not conclusively show permanent cessation of production. Thus,
we will review the evidence to determine whether it conclusively shows that no reasonably prudent
operator would have continued the unit. Clifton, 325 S.W.2d at 691. As we have determined, the
evidence conclusively shows that the well produced, then stopped producing for over two years
prior to the hearing on the motion for summary judgment.
Â Â Â Â Â Â The railroad commission production records show that production dropped to five barrels of
oil and one âmcfâ of gas in March of 1994, less than one year after completion of the well. It
rebounded for one month, then returned to five barrels for one month, then disappeared altogether. 
Alexander's affidavit shows that attempts were made during April, May, July, and August of 1994
to rework the well, provide for pumping, and dispose of salt water. The summary-judgment
evidence reveals no work on the unit after August 1994. From this we conclude that no fact issue
exists because the evidence conclusively shows that a reasonably prudent operator would have
discontinued operations due to a failure to achieve any production from the well. See Triton Oil
& Gas, 644 S.W.2d at 446. We overrule points two and three.
Â Â Â Â Â Â McDaniel's first point asserts that the acreage âearnedâ by production was not subject to
termination. No authority is cited to support the point, and as McKeown points out, our sustaining
this point would result in McDaniel's having the right to hold the acreage for an extended period
of time without making any attempt to regain production. This we are unwilling to do. A fair
reading of the instruments by which McDaniel claims an interest in the land makes no distinction
between acreage âearnedâ and other acreage. It is true that the farmout agreement allowed him to
earn assignments of acreage at various times, but once production was achieved and the acreage
assigned, the provisions of the lease and assignment would control his rights in and to that acreage. 
Having allowed production to cease for over two years, he should not be heard to say that the
farmout agreement prevents termination as to âearnedâ acreage. See id.
Â Â Â Â Â Â We conclude that McKeown, who succeeded to all of Wharton's rights, properly exercised his
right to retake possession and control of the well from the operator, who along with the remaining
defendants were successors-in-interest to Billy McDaniel.


 Thus, the court was correct in granting
summary judgment that the McDaniel interests in the 100-acre tract had terminated. We affirm the
summary judgment.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â BILL VANCE
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice
Before Chief Justice Davis,
Â Â Â Â Â Â Â Â Â Â Justice Cummings, and
Â Â Â Â Â Â Â Â Â Â Justice Vance
Affirmed
Opinion delivered and filed August 6, 1997
Do not publishÂ Â Â Â Â Â Â Â Â Â 



 style='text-indent:.5in'>Justice
Reyna, and

Justice
Davis

(Chief
Justice Gray dissenting with note)*

Affirmed in
part,

   Reversed
and remanded in part

Opinion
delivered and filed January 13, 2010

[CV06]

Â 

*Â Â Â Â Â Â Â Â Â Â  (Chief
Justice Gray dissents.Â  A separate opinion will not issue.Â  He
provides the following note:Â  The case books are filled with cases that
hold when the parties to an agreement execute multiple documents at the same
time, the documents are construed together as the agreement of the parties.Â 
See, e.g., Jones v. Kelley, 614 S.W.2d 95, 98 (Tex. 1981); Miles
v. Martin, 321 S.W.2d 62 (Tex. 1959); West KeyCite 95k164 k (Construing
Instruments Together).Â  This case, however, is the first and only case that I
have found or heard about in which a Court has held that a single writing,
which is on the front and back of a single sheet of paper in which one side
even references the other, is divided into two distinct and separate
agreements.Â  But that is what this Court has done.Â  The parties did
not ask for it.Â  The parties did not brief or suggest that there were two
separate agreements.Â  The reader is just reading along and boom, there it
is.Â  So when the Court raises the issue in footnote one and, without
reference to any legal authority to do so, divides the single writing into two
agreements to be analyzed separately for enforceability of each, I have to
wonder why and how.Â  And that simple footnote controls the disposition of
the appeal because it is undisputed that in what the Court contends is a different
agreement, the other agreement, on the same piece of paper, Spakes makes a
promise to pay $500 to Weber.Â  But according to the Court, and solely
because they hold there are two different agreements, the Court holds that the
promise of payment in one agreement is no consideration to support WeberÂs
promise to convey the property back to Spakes in the other agreement.Â  I
disagree with the CourtÂs analysis.Â  I view this single document as one
agreement.Â  As such, there is mutuality of obligation (consideration) to
support the agreement.Â  Thus, SpakesÂs contention on appeal, that WeberÂs
summary judgment evidence failed to establish that this element of a contract
was missing and therefore SpakesÂs claim for breach of contract failed, should
be sustained.Â  But this is another case in a long and growing line of
cases wherein the Court identifies an issue, or raises some matter, that the
parties have not raised and then proceeds to analyze the issue without notice
to the parties or giving the parties the opportunity to brief the issue.Â  See,
e.g., In re Trend Gathering & Treating, LP, 226 S.W.3d 478 (Tex.
App.ÂWaco 2006, order) (Gray, C.J., concurring & dissenting); Navasota Res., L.P. v. First Source Tex., Inc., 206 S.W.3d 791 (Tex.
App.ÂWaco 2006, order) (Gray, C.J., dissenting); In re Marriage of Eilers,
205 S.W.3d 637, 647 (Tex. App.ÂWaco 2006, pet. denied) (Gray, C.J., concurring
& dissenting); In the Interest of Z.A.T., 193 S.W.3d 197, 215 n.2
(Tex. App.ÂWaco 2006, pet. denied) (Gray, C.J., concurring).Â  I have repeatedly
expressed my disagreement but have been unsuccessful in preventing them from
continuing to re-lawyer the cases for the parties in this manner.Â  Id.Â  Accordingly, I respectfully dissent from both the procedure as used in this
proceeding and the results thereof.)









[1]
Â Â Â Â Â Â Â Â Â Â Â Â Â  Actually, the quoted
document includes two separate agreements: one for the purchase of the mobile
home for $1,500 and one for the safekeeping of the land located at 5713 Crest Road.Â  This case involves the latter agreement.





[2]
Â Â Â Â Â Â Â Â Â Â Â Â Â  Compare Tex. GovÂt Code Ann. Â§ 25.2162(a)
(Vernon 2004) (providing County Court at Law of Starr County with
subject-matter jurisdiction over family law matters and Âcontroversies involving
title to real propertyÂ concurrently with district court) with id.
Â§ 25.1282(a) (Vernon 2004) (providing statutory county courts of Johnson County with concurrent family law jurisdiction); cf. id. Â§ 26.043(4) (Vernon
2004) (constitutional county court does not have subject-matter jurisdiction in
Âa suit for divorceÂ).





[3]
Â Â Â Â Â Â Â Â Â  Notwithstanding
the Supreme CourtÂs reference to an Âaction in ejectment,Â we note that the
Court has more recently recognized that (since 1840) the trespass-to-try-title
statute (section 22.001 of the Property Code) Âeliminated ejectment actions in Texas.ÂÂ  Martin v. Amerman, 133 S.W.3d 262, 265 (Tex. 2004); see Tex. Prop. Code Ann. Â§ 22.001(b)
(Vernon 2000) (ÂThe action of ejectment is not available in this state.Â); see
also Act approved Feb. 5, 1840, 4th Cong., R.S., Â§ 1, 1840 Repub. Tex. Laws
136, 136, reprinted in 2 H.P.N. Gammel,
The Laws of Texas 1822-1897, at 310, 310 (Austin, Gammel Book Co. 1898)
(Âall fictitious proceedings in the action of ejectment shall be abolishedÂ and
Âthe methods of trying titles to land or tenements in this Republic shall be by
action of trespassÂ) (later codified as article 7364, Revised Civil Statutes of
1925).





[4]
Â Â Â Â Â Â Â Â Â Â Â Â Â  The term Âcounty
courtÂ as used hereinafter refers to a statutory county court unless otherwise
indicated.

Â 





[5]
Â Â Â Â Â Â Â Â Â Â Â Â Â  The county courtÂs
docket sheet indicates that the TRO application was filed on September 14.Â  The
next entry on the docket sheet indicates that the motion to transfer venue was
filed on October 5.Â  The next entry is for an October 19 order setting a
hearing on this motion.





[6]
Â Â Â Â Â Â Â Â Â Â Â Â Â  Although Spakes
characterized his lawsuit in the application for a TRO as a suit Âregarding
ownershipÂ of the property, he unequivocally states in the application that his
lawsuit Âis an action for breach of a written contract.Â





[7]
Â Â Â Â Â Â Â Â Â Â Â Â Â  The agreement is
dated October 26, 2004.Â  According to WeberÂs summary-judgment affidavit,
Spakes put the property in her name on October 27, 2003.





[8]
Â Â Â Â Â Â Â Â Â Â Â Â Â  Nevertheless, we are
required to review the merits of this appeal as to SpakesÂs breach-of-contract
claim which was addressed in WeberÂs summary-judgment motion.Â  See Bandera
Elec. Coop., Inc. v. Gilchrist, 946 S.W.2d 336, 336 (Tex. 1997) (per
curiam); Roehrs v. FSI Holdings, Inc., 246 S.W.3d 796, 810 (Tex.
App.ÂDallas 2008, pet. denied); see also Espeche v. Ritzell, 123 S.W.3d 657,
667-68 (Tex. App.ÂHouston [14th Dist.] 2003, pet. denied) (addressing merits of
claims addressed in summary-judgment motion and reversing on claim not
addressed).