NO. 07-02-0003-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

APRIL 30, 2003

_____

BETTY LOU MCCOY GRAYSON, ET AL., APPELLANTS

V.

CRESCENDO RESOURCES, L.P., ET AL., APPELLEES

_____

FROM THE 31ST DISTRICT COURT OF WHEELER COUNTY;

NO. 10,817; HONORABLE STEVEN R. EMMERT, JUDGE

_____

Before QUINN and REAVIS, JJ., and BOYD, S.J.[1]

**OPINION**

Appellants Betty Lou McCoy Grayson, Mitzi Leigh Devoll, Marilyn McCoy, Robert

McCoy, Roy D. McCoy, Misti Rel, Leon Red, and Kelton Oil & Gas Co., bring this appeal

---

[1]John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. §75.002(a)(1) (Vernon Supp. 2003).

challenging a take-nothing judgment in favor of appellees Crescendo Resources, L.P., Crescendo Management, Amoco Production Company, BP Corporation North America, and Minco Oil & Gas Co. (collectively referred to as Amoco). We affirm the judgment of the trial court.

Appellants are lessors in leases covering land in Section 24, Block 4, Camp County School in Wheeler County. The Amoco parties are lessees in leases covering land in Section 24 and surrounding sections. Appellants brought suit against Amoco for breach of implied covenants to protect against drainage and to reasonably develop the leases.

The sole issue presented for our decision is whether the trial court erred in refusing to submit a jury question on appellants' claim for failure to reasonably develop the lease. The jury found against appellants on their drainage claim resulting in the take-nothing judgment being appealed.

Amoco completed its first well, the Reynolds 1-25, in the area on the west edge of Section 25. The well penetrated the A chert zone of the Upper Morrow formation, but had only marginal production from that zone. The well was completed to another zone in August 1997. Based upon information from the 1-25, Amoco drilled a well on Section 24, which is located to the west of Section 25. This well, the Hall-McCoy 1-24, was completed in the southeast quarter of that tract in May 1998 and was "fracked" the same month. Amoco selected this location to obtain production from the A chert zone, and it did so.

2

This well had good gas production of approximately 30,000 MCF per month initially, but production from it declined rapidly.

Section 23 is just south of Section 24 and Section 20 adjoins Section 23 on the west. Amoco also held leases on these three sections. In August 1998, Amoco completed the Fowlston 1-23 well in the northwest quarter of Section 23. This well was drilled at a location 467 feet from the north boundary and 1,000 feet from the west boundary of the section. The well bottomed approximately 200 feet closer to the north boundary of Section 23, or about 2050 feet southwest of the 1-24 well. The A chert zone was less than half as thick at the 1-23 well location, but the formation was more porous. Its initial production was similar to that of the 1-24. In October 1998, Amoco undertook a fracking operation on the 1-23 well, which increased its production dramatically to the point that in November 1998, it produced 186,000 MCF. Production from the 1-24 well decreased again after completion of the 1-23 well. Production from the 1-24 well decreased the month after the "fracking" operation on the 1-23, but returned to its former level the ensuing month.

Before completion of the 1-23, Amoco spudded a well in the northwest quarter of Section 24, again seeking production from the A chert zone. This was the 2-24 well, which was completed in November 1998. The 2-24 passed through a narrow portion of the A chert, but was not productive from that zone and production was obtained from a lower zone. Amoco completed a well in the northwest quarter of Section 20, denominated the Fowlston 1-20, in February 1999.

On December 15, 1999, appellants filed suit alleging breach of the covenants to protect against drainage and to reasonably develop Section 24. The suit was based upon Amoco's alleged failure to drill a well in the southwest quarter of Section 24 at a mirror image location from the 1-23. During the four-day jury trial held in December 2001, the parties presented expert testimony concerning the location of the A chert, whether there was drainage from Section 24, and whether a reasonably prudent operator would have drilled another well in the southwest quarter of Section 24. Although the trial court submitted jury questions on appellants' claim for breach of the covenant to protect against drainage, it refused to submit the following question and instruction requested by appellants:

> In answering question 1, you are instructed that a "reasonably prudent operator" is obligated to develop an oil and gas lease in the manner and with the diligence of a reasonably prudent operator under all the surrounding facts and circumstances. Such an operator has a duty to seek favorable administrative relief. You are instructed to consider that by drilling a well a reasonably prudent operator would have knowledge of the risks involved and would have a reasonable expectation of encountering a producing zone and producing gas in quantities that would bring profit to the operator after deducting the costs of drilling, testing, equipping, completing, operating, and marketing, together with taxes and royalties.
>
> Plaintiffs' Requested Question 1
>
> Would a reasonably prudent operator owning only Section 24 leases have drilled a well in Section 24 at the mirror image location to the Fowlson Estate 1-23 well?

It is well established that a court must submit all properly requested questions, instructions and definitions raised by the pleadings and supported by some evidence. Tex.

4

R. Civ. P. 277, 278; *Triplex Communications v. Riley*, 900 S.W.2d 716, 718 (Tex. 1995). Appellants' complaint on appeal is predicated on their position that the evidence was legally sufficient to support a finding on their claim for failure to develop, making the trial court's refusal to submit that question reversible error.

Amoco does not dispute that in a lease such as we are concerned with here, where the lessee's obligation to develop is not specifically addressed, the law implies a covenant to reasonably develop the premises. *See Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 567 (Tex. 1981). The lessee's duty under that covenant is to act as a reasonably prudent operator under the same or similar circumstances. *Id.* at 567-68. The covenant to develop is only implicated after production is secured and requires the lessee to act with reasonable diligence so that the operations result in a profit to both lessor and lessee. *Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 693 (1959). The obligation to drill additional wells depends on the facts of each particular case. *Senter v. Shanafelt*, 233 S.W.2d 202, 206 (Tex.Civ.App.–Fort Worth 1950, no writ). The covenant requires a balance between a lessor's desire for rapid production and the lessee's desire to keep production costs down. *Clifton,* 325 S.W.2d at 693.

A claim for breach of a covenant to protect against drainage from other wells requires the lessor to prove substantial drainage and that a reasonable and prudent operator would have acted to prevent the drainage because the amount of oil or gas to be recovered by a productive well would cover the cost of drilling the well and create a

5

reasonable expectation of profit. *Alexander*, 622 S.W.2d at 568. Here, because the jury found there was no substantial drainage, it did not reach the question whether Amoco acted as a reasonably prudent operator. Because of this, appellants argue the jury's finding on the covenant to protect against drainage did not preclude recovery on their claim for failure to develop. They also argue the trial evidence showed Amoco failed to act as a reasonably prudent operator, and this evidence supported both their claims, requiring submission of their requested instruction and question.

The trial evidence showed Amoco established two producing wells on Section 24 and this was the maximum allowed under Railroad Commission rules without a waiver. To produce from a third well on Section 24, Amoco would have had to shut in the 1-24 well or obtain a waiver based on a showing that the third well was necessary to prevent waste or protect correlative rights. The evidence was conflicting as to whether Amoco could have made such a showing.

In supporting their argument that the evidence showed a reasonably prudent operator would have drilled an additional well on the southwest quarter of Section 24, appellants cite the testimony of their engineering expert, Rick Johnston, that a well drilled at a mirror image to the 1-23 well would have produced gas at the same rate as the 1-23 and would have made a reasonable profit. His opinion was based upon the opinion of appellants' geologist that the A chert production zone was centered in the southwest quarter of Section 24.

6

In response, Amoco presented expert testimony to the effect that the information on which appellants' geologist's opinion was based was equally consistent with the zone being centered elsewhere. Their expert opined that a seismic survey of the area indicated the zone did not extend to the southwest quarter of Section 24, and a well drilled there would not have been profitable. Amoco also presented evidence that it had invested in excess of five million dollars developing the reserves under Section 24.

This evidence requires us to determine whether it was some evidence of their claim for failure to develop the lease or only supported their drainage claim. Appellants rely on two portions of their expert's testimony that the well they sought:

> . . .would be a development well. The different types of wells that are making this distinction would be an exploratory well, where you are going into an area where you don't have production from a particular producing horizon. That is an exploratory well. Here we have production from a particular interval that we are trying to establish production in Section 24 for. So I would consider it to be a developmental well. And development wells typically have lower risks, greater chance of success.

This particular testimony was elicited in the context of the chances of the well desired by appellants being successful. The other portion of his testimony with respect to a development well was also in response to a question seeking an explanation of a "development" well and is as follows:

> Well, a development well is an additional well placed into a proven producing reservoir. The reservoir that Dr. Kerr has mapped, that the 1-23 produces from, is what I consider to be a proved producing reservoir. Somebody trying to drill another well into that reservoir is drilling what I call

a development well . . . An exploratory well is, you are drilling in an area, trying to establish production from a horizon that is not being produced in the immediate area . . .

In both instances, a development well is distinguished from an exploratory well in terms of risk. Under Texas law, there is no independent implied covenant to explore the lease apart from the covenant to develop. *Sun Exploration & Production Co. v. Jackson*, 783 S.W.2d 202, 204 (Tex. 1989). The statements also followed the expert's testimony that "the hypothetical offset protection well is going to be what I would term a development well." Taken together, the statements merely establish that a well drilled to protect from drainage is, by definition, a development well because it is drilled into a known producing reservoir. They are not probative on the question of a lessor's implied duty to develop the lease.

Appellants also claim that the testimony from their engineering expert that a reasonably prudent operator would have sought administrative relief from the Railroad Commission and would have been able to obtain it applies both to the obligation to offset and the obligation to develop. However, the record does not support that interpretation. Just prior to the expert's testimony on the subject, he stated, "we are trying to *offset* the 1-23 well . . ." [emphasis added]. Just after his testimony on the subject, he was asked when would a "hypothetical reasonably prudent operator have drilled and completed the hypothetical *offset protection* well?" [emphasis added]. The testimony itself makes no reference to the development obligation.

8

Appellants cite *General Crude Oil Co. v. Harris*, 101 S.W.2d 1098 (Tex.Civ.App.--Texarkana 1937, writ dism'd ), for the proposition that a court may allow recovery for both drainage and for oil lost from recovery as a result of the failure to reasonably develop. *Id.* at 1102. However, the unique facts of the case showed that the movement of oil through the formation meant that a delay in production would result in a net loss of oil recovered. *Id*. Here, there was no evidence that production from the 1-24 well would result in any net loss of gas beyond that lost by any drainage.

This record does not show that appellants presented legally sufficient evidence to support a finding that Amoco's failure to drill an additional well on Section 24 breached its implied covenant to reasonably develop the lease. Without legally sufficient evidence, the court did not err in refusing the requested instruction and question. Appellants' first point is overruled. That holding obviates the need to address Amoco's waiver argument.

Accordingly, the judgment of the trial court must be, and is hereby, affirmed.


John T. Boyd
Senior Justice

9