631 So.2d 716 (1994)
Albert C. LEGE, et al., Plaintiffs-Appellants,
v.
LEA EXPLORATION COMPANY, INC., Defendant-Appellee.
No. 93-605.
Court of Appeal of Louisiana, Third Circuit.
February 2, 1994.
Allan Leland Durand, Lafayette, for Albert Lege, et al. *717 Patrick S. Ottinger, Lafayette, for Lea Exploration Co., Inc.
Before LABORDE, THIBODEAUX and DECUIR, JJ.
LABORDE, Judge.
In this oil and gas dispute, plaintiff-landowners seek to have a mineral lease declared dissolved beyond the period of its production in paying quantities so that it may recover subsequent profits and custody of the property. Finding no error in the trial judge's application of the law under the circumstances, we affirm.

FACTS
This dispute arises from a mineral lease granted in 1975 and extended in 1979. For the lease to exist beyond its primary term, both the lease and the Mineral Code required that the well "produce in paying quantities." The heart of the dispute calls into question the legal classification of certain expenditures by the lessee. Allocation of these expenditures to the category of "operating expenses," which are deductible from a producing properties gross revenues, could result in our finding that the well did not consistently "produce in paying quantities" and a forfeiture of the lease at some point during the years 1981 through 1984; their classification as "repair and remedial" or "equipment" capital costs, on the other hand, would lead us to affirm the lower court's conclusion that the well never ceased to "produce in paying quantities."
The trial judge, after studying the legal authority and all of the evidence, including the well's financial records and conflicting evidence, chose the latter approach, giving rise to the instant appeal, which is marked by excellent briefs filed by each party.
The substantive law applicable to this matter is LSA-R.S. 31:124, whose Comment concludes as follows:
The manner in which the test for production in paying quantities is stated in Article 124 is articulated well in the decision of the Texas Supreme Court in Clifton v. Koontz, [160 Tex. 82], 325 S.W.2d 684, 691 (1959):
"... [T]he standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.
"In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances, and whether or not the lessee is holding the lease merely for speculative purposes.
"The term `paying quantities' involves not only the amount of production, but also the ability to market the product.... Whether there is a reasonable basis for the expectation of profitable returns from the well is the test. If the quantity be sufficient to warrant use of the [product]... in the market, and the income therefrom is in excess of the actual marketing cost, and operating costs, the production satisfies the term `in paying quantities.'"
The test set forth in the Koontz decision is essentially a statement of the manner in which the combined test set out in the Louisiana jurisprudence has functioned and appears preferable to any mechanical test of requiring that as to the working interest there must be only meeting of current operating costs with a "small" but undefined profit left over and that as to the lessor's royalties, there must be "serious" or "adequate" consideration when compared with bonuses, rentals, or other sums paid to the lessor. The courts will be entitled to consider all of the same evidentiary factors which have been of influence previously, but the manner of statement of *718 the legal principle applied will more nearly reflect the true decisional process.
On review, the principal disputed item of expenditure (among several) is a saltwater disposal system, which cost $11,574 in 1981. Plaintiff argues that had this expense not been incurred, the saltwater would have been "lifted" and transported by trucks on a regular basis; since lifting and trucking are undisputed "operating expenses," by analogy, so should be the expenditures which replace them.
This view was rejected by the trial judge, whose Reasons we quote at length:
This matter came on for trial on the merits on November 26, 1991, on plaintiffs' demand for cancellation of an oil and gas lease on the grounds of lessees' failure to obtain production in paying quantities, or alternatively, their failure to timely commence reworking operations. Plaintiffs attempted to establish, primarily through expert testimony, that the financial records pertaining to the well in question, namely, Lege # 2, show that, for the years 1980 through 1984, expenses exceeded income, thus showing a lack of production in paying quantities. All of the financial records pertaining to the well were introduced into evidence and the same records were used by experts for the plaintiffs and the defendants. Plaintiffs' claim, as distinguished from defendants, is premised on their contention that virtually all out-of-pocket expenses for the production of oil constitute operating expenses. While this contention appeals to common sense, it is not supported by applicable law and generally accepted accounting principles in the oil and gas industry for determining production in paying quantities.
The court's appreciation of the development of the law pertaining to production in paying quantities is that the principle was established to prevent a lessee from holding a lease and continuing their operations thereon merely for speculative purposes. The law requires a showing on the part of the lessee that, at all times, there was a reasonable expectation, by continuing production, of securing a return on the investment or minimizing any loss. LSA-R.S. 31:124, and jurisprudential interpretations of same. The methodology for determining, in part, whether there is production in paying quantities involves determining whether lease operating expenses exceed the production revenue attributable to the lessees original right.
Plaintiffs contend that, in the case at hand, expenses exceeded revenue. They attempted to support their contention through expert testimony that certain expenses should properly be categorized as lease operating expenses rather than other expenses such as re-working costs, repairs to capital items, depreciation, and, in general, categories which would not, according to defendants' experts, be considered as lease operating expenses. Plaintiffs' experts couched their testimony in terms of whether or not a certain expense was necessary to continue and maintain production of oil. All expenses that were considered by the experts as being necessary to continue and maintain production were categorized under lease operating expenses. To further bolster their position, plaintiffs' experts offered opinions that these same expenses did not increase the reserves. Accordingly, most of the plaintiffs' experts' testimony was couched in terms of a certain expense being properly classified as a lease operating expense since it did not increase reserves and was necessary for maintaining production. The court feels that this testimony, while sounding logical and appealing to common sense, has little probative value in terms of a resolution of this case inasmuch as it ignores the legal and general accounting principles involved in determining lease operating expenses for establishing production paying quantities.
The court feels that the defendants' expert's testimony had great probative value because it was offered within the framework of established law and coincides with general accounting principles in the oil and gas industry. More particularly, the court finds that the law and general accounting principles in the oil and gas industry compel an acceptance of the categories used by Mr. Hise, namely, that expenses are to be categorized as lease operating expenses, repair and remedial expenses, equipment purchases and completion or re-completion (workover) costs. Generally speaking, the operating expenses *719 are distinguished from the other three categories in that the other three categories are considered extraordinary expenses, that is, expenses that would not be thought of as normal operating costs. As the testimony shows, the failure of plaintiffs' experts to allocate substantial expenses to the non-operating expense categories is what gives rise to the variance in the figures between the plaintiffs' experts and the defendants' experts in their ultimate conclusion as to whether or not the operating expenses exceeded revenue. Illustrious examples of this are the differences in the treatment in re-working operations and saltwater disposal costs by the experts. The court finds the testimony of defendants' experts to be well founded in that their opinions are grounded in accepted legal and accounting principles and, generally speaking, are grounded in solid reasoning. The court accepts as credible the testimony of defendants' experts and adopts Mr. Hise's general classification of expenses in determining the allocation of operating expenses for the purposes of determining whether, in this case, there was production in paying quantities.
For purposes of clarification, the court feels that a comment on the saltwater disposal costs is in order. The court feels that, as to this cost, the cost of the conversion itself should be capitalized and, while the cost is a consideration overall of whether to continue operations, it should not be treated as part of the operating expenses as that term is used in the industry. The court finds, after careful consideration, that the cost of conversion of the saltwater disposal well, as well as workover expenses, are a capital expenditure and should not be included as an operating expense for the purpose of determining there was production in paying quantities.
With these findings, the court is compelled to the conclusion that there was production in paying quantities during the period complained of by plaintiffs. Considering the facts established and the opinion of defendants' experts, which the court accepts with the qualifications mentioned herein, the court is satisfied that during the period complained of by plaintiffs, the lessees were at no time holding the lease and continuing their operations thereon merely for speculative purposes. The lessees at all times had a reasonable expectation of continuing production and securing a return on their investment or minimizing any loss.

* * * * * *
We adopt in large measure the well-received Reasons of the trial judge, because we are unable to accept the premise of plaintiff's position, that the nature of a lessee's cost is determined strictly by the substitution accomplished. Instead, we choose to follow the more traditional understanding that an expenditure's classification is generally determined more by whether it is ordinary and recurring or extraordinary and largely nonrecurring in nature. "Central to the Koontz decision is the philosophy that fixed or periodic cash expenditures incurred in the daily operation of a well (sometimes called out-ofpocket lifting expenses) are to be classified as operating expenses, while one time investment expenses, such as drilling and equipping costs are to be treated as capital expenditures." Pshigoda v. Texaco, Inc., 703 S.W.2d 416, 418 (Tex.App.Amarillo 1986, writ ref'd n.r.e.). In our opinion, the trial judge's assessment of the law is correct.
Similarly, we are not persuaded by appellants' argument that an expense is only characterized by its pre-production or post-production timing. In our estimation, from the record before us, there is no rule which strictly forbids allocation of certain "extraordinary expenses" incurred postproduction from being allocated to the capital expenditure category.
Having so found, we are disinclined to upset the thoughtful decision reached by the trier of fact, who was presented with conflicting expert evidence.
The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Economy Auto Salvage v. Allstate Ins. Co., 499 So.2d 963 (La.App. 3d Cir.) writ denied, 501 So.2d 199 (La.1986); Thompson v. Tuggle, 486 So.2d 144 (La.App. 3d Cir.) writ denied, 489 So.2d 919 (La.1986); See Graver Tank & Mfg. Co. v. Linde Air Products, Co., 336 *720 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949); Berger v. Iron Workers Reinforced Rodmen Local 201, 843 F.2d 1395 (D.C.Cir. 1988) cert. denied, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989); W.S. Shamban & Co. v. Commerce & Industry Ins. Co., 475 F.2d 34 (9th Cir.1973); Hicks v. U.S., 368 F.2d 626 (4th Cir.1966); U.S. v. Springfield, 276 F.2d 798 (5th Cir.1960); Bryon v. Gerring Industries, Inc., 328 N.W.2d 819 (N.D.1982); 9 Wright & Miller, Federal Practice and Procedure, § 2586 (1971).
Lirette v. State Farm Ins. Co., 563 So.2d 850, 853 (La.1990). In accord, Opelousas Prod. Credit v. B.B. & H., 587 So.2d 812, 814 (La.App. 3d Cir.1991) ("Where the testimony of expert witnesses differ, it is for the trier of fact to determine the most credible evidence and a finding of fact in this regard will not be overturned absent manifest error."). In this case, presented with expert opinions reaching opposite conclusions, we cannot say the trial judge erred. Plaintiff's first two experts, engineers, were largely unpersuasive. Each was called to testify as to the proper classification of certain expenditures by defendants. The first essentially concluded that virtually any postproduction expenditures should be written off as expenses as they are incurred because, although she "[did not] know what accounting would do with it," as an engineer she "would have to come up with the money to pay for it that month." The second concurred in the opinion of the first, but both confessed they could see nothing in lessee's actions to suggest speculative motives. Plaintiff's third expert witness joined the opinions of the first two on direct, but admitted under effective cross-examination that he did not know whether the rules for classifying expenditures differed in cases (like this one) concerned with the question of whether a well produces in paying quantities or not. His experience, and his opinions, were derived from provisions governing financial reporting requirements; indeed, he confessed to not having a comfortable understanding as to what was meant by the phrase "producing in paying quantities" beyond the limitations of his more narrow reporting field.
Defendant's first expert similarly admitted that he could not precisely define the legal definition of "producing in paying quantities." The crucial difference between his approach and those of the opposing experts was that he classified the costs of equipment, including installation, as capital expenses, not ordinary ones. Under this view, he concluded that the well produced in paying quantities regardless of whether capital costs were used for the workover period or not. He further opined that replacing certain durable pieces of equipment, or their parts, can best be classified as extraordinary, not ordinary. Defendant's second expert, an accountant, buttressed this point of view in defining capital expenditures as those that prolong the useful life or increase the value of an asset. Such determinations made outside the narrow confines of S.E.C. financial statements, he said, frequently require judgment calls.
The trial judge expressly found most credible the opinion of defendant's third expert, Mr. Hise, a former petroleum engineering professor at LSU for sixteen years with many years practical experience as an independent oil consultant and producer in addition to having worked with a major oil company. In his estimation, reworking expenses were not to be listed among ordinary expenses; nor were the saltwater well costs over and above everyday operating costs. We find no clear error in the trial judge's credibility determinations with regard to the vital expert testimony elicited, nor in his holding in defendant's favor. Plaintiffs did not offer evidence for the trial court's consideration except on a very few of the considerations contained in the Comments to LSA-R.S. 31:124 and have not shown that defendant held the subject property hostage for speculative purposes.

Decree
In light of the foregoing, the judgment of the trial court is affirmed, at appellants' costs.
AFFIRMED.
DeCUIR, J., dissents.