# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

## 04-345

**CHESAPEAKE OPERATING, INC.**

**VERSUS**

**ROBERT RICHARDSON, ET UX.**

**************

**SYLVIA R. COOKS**
**JUDGE**

**************

APPEAL FROM THE
THIRTIETH JUDICIAL DISTRICT COURT
PARISH OF VERNON, DOCKET NUMBER 61,367
HONORABLE JOHN C. FORD, PRESIDING

Court composed of Sylvia R. Cooks, Marc T. Amy, and John B. Scofield,[*] Judges.

Amy, J., concurs and assigns written reasons.

**REVERSED.**

Patrick S. Ottinger
Herman E. Garner, Jr.
Ottinger Hebert, L.L.C.
1313 West Pinhook
P.O. Drawer 52606
Lafayette, Louisiana 70505-2606
(337) 232-2606
COUNSEL FOR APPELLEE:
    Chesapeake Operating, Inc.

Guy E. Wall
Wall & Bullington, L.L.C.
2030 Dickory Avenue, Suite 200
New Orleans, Louisiana 70123
(504) 736-0347
COUNSEL FOR APPELLANTS:
    Robert Richardson, et al.

---

[*]John B. Scofield participated in this decision by appointment of the Louisiana Supreme Court as Judge *Pro Tempore.*

**COOKS, Judge.**

## STATEMENT OF THE FACTS

On December 20, 1996, Robert Richardson entered into an oil and gas lease with Chesapeake Operating, Inc. covering 1,121.96 acres in the Austin Chalk trend in Vernon, Rapides and Allen parishes. The lease paid $150.00 per acre for a primary term of five years provided there was production on the property. In the absence of production, the lease terminated on December 20, 1997, unless Chesapeake paid a monthly rental of $50.00 per acre. There was no production on the property during 1997. On December 20, 1997 the lease expired and no rental payment was made by Chesapeake. Gary Dunlap, land manager for Chesapeake, explained Chesapeake's decision to delay payment: "[A]ll rentals were under review, based upon the location of the acreage. And we delayed until the last minute, based upon that review." He also testified the "wells drilled in the south end of the trend in Louisiana, also on the north, and also on the east and west, had proved the limits of the trend to be smaller than we expected." Because the trend was smaller than expected Chesapeake did not want to lease unproductive acreage. Once Chesapeake completed the review, it decided to continue the lease for the price of $50.00 per acre and sometime after the expiration date, tendered the full amount of the rental to Mr. Richardson. By letter dated January 28, 1998, Mr. Richardson rejected the late payment and demanded Chesapeake release the acreage.

On February 27, 1998, Chesapeake filed a petition for Declaratory Judgment asking that the lease be declared in full force and effect. Chesapeake alleged, and continues to allege on appeal, it's failure to make timely rental payments were the result of a "good faith mistake," "inadvertence and oversight" in the administration of its leases. Richardson filed a reconventional demand for damages under La.R.S

2

31:206 and 207. In July and August, 1998, Chesapeake finally furnished a release of the property and dismissed the principal demand. Mr. Richardson, however, did not dismiss his reconventional demand for damages. Chesapeake filed a motion *in limine* to prohibit Mr. Richardson from presenting the testimony of Guy Ellison, an expert in oil and gas leasing in the Austin Chalk trend, and a motion for partial summary judgment. The trial court granted Chesapeake's motion for partial summary judgment and motion *in limine*. The trial court reviewed Mr. Ellison's affidavit and deposition and found "[o]nly two of the underlying reasons are facts. . . .[t]he other underlying factors are opinions, the basis of which is unknown." He further stated:

> Article 702, et seq, of the Louisiana Code of Evidence requires that the expert demonstrate the testability of the expert's technique and methodology used to form the basis of his opinion is generally accepted in the scientific community. There were no facts showing what other wells were producing in the general area nor what other tracts were leased in close proximity of this area by unnamed competitors.
> The court finds the testimony of the expert as provided to this court does not rise to the level of reliability required by <u>Daubert</u> and Article 702 of the Louisiana code of evidence.
> For these reasons, the motion in limine and the motion for summary judgment are granted.

Mr. Richardson appeals the trial court ruling.[**] For the reasons assigned below, we reverse the decision of the trial court and remand for trial on the merits.

## LAW AND DISCUSSION

**Motion *in Limine***

Louisiana Code of Evidence Article 702 provides, in relevant part:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Federal Rule of Evidence Article 702 contains identical language and was

---

[**] Mr. Richardson's claim for punitive damages was disposed of by the trial court on a no cause of action motion filed by Chesapeake. That issue is not before us on appeal.

interpreted in *Daubert v. Merrill Dow Pharmaceutical, Inc.,* 509 U.S. 579. 113 S.Ct. 2786 (1993). *Daubert* dealt with the admissibility of testimony by an expert witness linking a prescription drug with birth defeats.

Prior to revisions to the Federal Code of Evidence, under *Frye v. United States*, 293 F. 1013 (1923), "expert opinion based on a scientific technique [was] inadmissible unless the technique is 'generally accepted' as reliable in the relevant scientific community." *Daubert,* 509 U.S. at 584, 113 S.Ct. at 2792. *Daubert* rejected the "general acceptance" standard in favor of a more flexible approach. Citing Federal Rule of Evidence Article 702, the Court stated:

> Nothing in the text of this Rule establishes "general acceptance" as an absolute prerequisite to admissibility. Nor does respondent present any clear indication that Rule 702 or the Rules as a whole were intended to incorporate a "general acceptance" standard. The drafting history makes no mention of *Frye,* and a rigid "general acceptance" requirement would be at odds with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Beech Aircraft Corp. v. Rainey*, 488 U.S., at 169, 109 S.Ct. at 450 (citing Rules 701 to 705). *Daubert*, 113 S.Ct. at 2794.

Comments under Louisiana Code of Evidence Article 702, indicate Louisiana, by adopting the federal language, also intended to "[provide] a more positive approach to the reception of expert testimony than that afforded by former R.S. 15:463 et seq." Under the current article in Louisiana, the "criterion is whether the particular specialized knowledge would 'assist the trier of fact to understand the evidence or to determine a fact in issue,' not whether the question in issue involves 'knowledge obtained only by means of special training or experience,' as provided in former R.S. 15:464." La.Code Evid. art. 702 cmt. a.

Applying the principles in *Daubert* and Louisiana Code of Evidence Article 702, we find the trial court erred in excluding the testimony of Guy Ellison. The trial court also erred in granting the motion to strike Mr. Ellison's supplemental affidavit

and exhibits which were submitted to Mr. Richardson's motion for reconsideration of the partial summary judgment. Mr. Ellison, as a recognized expert in the oil and gas industry, possesses the "technical, or other specialized knowledge [which] will assist the trier of fact to understand the evidence or to determine a fact in issue[.]" The primary issue in the case is whether Chesapeake's failure to provide a timely release of the acreage caused Mr. Richardson to suffer damages. Mr. Ellison possesses a level of expertise regarding established customs and practices in the oil industry and would assist the jury in obtaining a full understanding of the factors involved in making a determination whether to lease or abandon a site. Additionally, he can testify as to the market price for oil at the time and the price per acre paid by other companies. He can interpret for the jury the current data in the area, the production or non-production of existing wells and explain the use of new technology. Mr. Ellison's knowledge of industry practices will assist the jury in assessing the reasonableness of Chesapeake's management of its rental properties as well as the reasonableness of Mr. Richardson's belief in his ability to obtain a higher price for his land. The testimony of an expert such as Mr. Ellison is not only relevant, but necessary in order for a plaintiff to prove his case. We find the trial court erred in applying the "general acceptance" standard and excluding the testimony of Mr. Ellison.

**Motion for Partial Summary Judgment**

Louisiana Revised Statutes 31:206 (B) provides, in relevant part:

When a mineral lease is extinguished prior to the expiration of its primary term, the former lessee shall, within ninety days after the extinguishment, record an act evidencing the extinction or expiration of the lease in the official records of all parishes wherein the lease is recorded.

Louisiana Revised Statutes 31:207 provides, in relevant part:

If the former owner of the extinguished or expired mineral right fails to furnish the required act within thirty days of receipt of the demand or if the former lessee of a mineral lease fails to record the required act within ninety days of its extinguishment prior to the expiration of its primary term, he is liable to the person in whose favor the right or the lease has been extinguished or expired for all damages resulting therefrom and for a reasonable attorney's fee incurred in bringing suit.

Chesapeake contends Mr. Richardson will be unable to prove "he missed an actual, identifiable opportunity" to lease the land due to Chesapeake's failure to provide a timely release. The trial court agreed and dismissed the suit. We find the trial court erred in holding Mr. Richardson must prove an "actual, identifiable opportunity" to lease. The standard of proof is preponderance of the evidence. Mr. Richardson need only prove it more probable than not he would have been able to lease his property had Chesapeake complied with its statutory duty.

In *Edmundson Brothers Partnership v. Montex Drilling Company, Inc.*, 98-1564 (La.App. 3 Cir. 5/5/99), 731 So.2d 1049, this court affirmed an award of damages for lost leasing opportunities. The plaintiff in *Edmundson* was not required to prove an " actual, identifiable opportunity" rather the court used preponderance of the evidence standard and found "based on all testimony [it is] more probable than not that plaintiff would have demanded a full lease in 1988 had he been aware at that time of the expiration of the Shell Lease." *Id.* at 1065. The trial court based his decision on testimony indicating the various lease extensions were executed in the area during the time in question and the fact that there was past production on the tract of land involved in the dispute. The trial court stated:

This Court believes more probable than not that [plaintiffs] would have demanded a new lease. This Court finds more probable than not that plaintiff's property, if available for lease in 1988, would have been an attractive property and would have brought a bonus of $100.00 per acre plus rentals of $25.00 per acre for two years.

*Id.* at 1065-66. (See also, *Crane v. Sun Oil Company*, 233 So.2d 919 (La.1970),

where the court applied a "preponderance of the evidence" standard of proof.)

There is evidence in the record to indicate Chesapeake acted in its own self interest at the expense of the landowner in failing to comply with its statutory duty. Gary Dunlap, land manager for Chesapeake, testified Chesapeake delayed rental payment because at that time "all rentals were under review, based upon the location of the acreage. And we delayed until the last minute, based upon that review." He also testified the "wells drilled in the south end of the trend in Louisiana, also on the north, and also on the east and west, had proved the limits of the trend to be smaller than we expected." Because the trend was smaller than expected Chesapeake did not want to take a chance on unproductive acreage. Moreover, it was Chesapeake who sued to enforce the rental provisions after the expiration date on the lease, thereby, entangling the property in litigation and further diminishing any opportunity to re-lease the land. A reasonable person could conclude no company would be interested in leasing property which is embroiled in litigation. Chesapeake's own actions may have foreclosed any opportunity for Mr. Richardson to re-lease the land.

When the trial court excluded the testimony of Mr. Ellison, he foreclosed any opportunity Mr. Richardson may have had to establish the elements of his case. The record indicates had Mr. Ellison been allowed to testify he would have established in January 1998, oil prices were high and seismic tests were being conducted. There was considerable leasing activity in the Austin Chalk area at that time. Chesapeake was paying an average of $493.00 per acre for leases. He would have testified customarily an oil company will not lease property where there is an existing lease in its primary term. Additionally, he would have testified timing in the oil industry is critical. Property can go from extremely valuable to worthless in a matter of months. By the time this property was finally released, six months later, the price for

7

oil had dropped to $12.00 or $13.00 a barrel and seismic tests in the area was not favorable for drilling. He would have testified based on his knowledge and expertise in the oil industry "acreage covered by the Lease was very valuable until June of 1998, shortly before Chesapeake withdrew its lawsuit and submitted a release. This coincided with the time that the price of oil declined thirty percent (30%) to $12 or $13/barrel and a number of wells had poor results. Wells in this area could not be economically justified at this price. At this time, several companies decided to significantly reduce their leasing activities in the Austin Chalk trend where such acreage was located. From that point forward, opportunities to lease such acreage would be extremely limited."

We find there is enough evidence in the record to establish a genuine issue as to whether Mr. Richardson suffered damages as a result of Chesapeake's failure to timely release the property. *Mills v. Davis Oil Company*, 11 F.3d 1298 (5th Cir. 1994) stated the measure of damages for failure to provide a timely release are "the difference between [the landowner's] current position and the position he would have occupied had Davis timely complied with his statutory duty." *Id.* at 1303.

We find the trial court improperly excluded the testimony of the expert witness, and foreclosed any opportunity for Mr. Richardson to adequately and fairly present his case to the jury. Therefore, we reverse the motion *in limine* and motion for partial summary judgment and remand for trial

## DECREE

The decision of the trial court is reversed and the case is remanded for trial on the merits. All costs of this appeal are assessed to Chesapeake Operating, Inc.

**REVERSED.**

8

NUMBER 04-345

COURT OF APPEAL, THIRD CIRCUIT

STATE OF LOUISIANA

CHESAPEAKE OPERATING, INC.

VERSUS

ROBERT RICHARDSON, ET UX.

AMY, J., concurring.

I join the majority in its reversal of the granting of the motion in limine and the motion for partial summary judgment. With regard to the motion in limine, I agree with the majority that the trial court erred by rejecting the oil and gas leasing expert's affidavit. In my opinion, insofar as the trial court's ruling could be interpreted to have prohibited the expert from testifying at trial, as opposed to removing the affidavit from consideration in the summary judgment proceedings, I find any such ruling premature. Therefore, should a further hearing be required pursuant to La.Code Evid. art. 702 and the principles enunciated under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), I do not find our determination today preclusive of further consideration of admissibility under those standards. Furthermore, I join in the majority in its determination to reverse the motion to strike granted by the trial court. In my opinion, this issue is rendered moot by reversal of the partial summary judgment.