STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CA 04-1464


HOMER D. WOOD, ET AL.

VERSUS

AXIS ENERGY CORPORATION, ET AL.


**********

APPEAL FROM THE
THIRTY-EIGHTH JUDICIAL DISTRICT COURT
PARISH OF CAMERON, NO. 10-14779
HONORABLE H. WARD FONTENOT, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Oswald A. Decuir, Michael G. Sullivan, and Billy Howard Ezell, Judges.


**AFFIRMED AS AMENDED.**


**Edward C. Abell, Jr.**
**Onebane, Bernard, Torian**
**P. O. Box 3507**
**Lafayette, LA 70502-3507**
**(337) 237-2660**
**Counsel for Defendants/Appellees:**
**Halliburton Company**
**Mokeen Ltd. Partnership**

**Raymond Anthony Beyt**
**Beyt & Beyt**
**P. O. Box 52157**
**Lafayette, LA 70505**
**(337) 233-6771**
**Counsel for Secondary Defendants/Appellants:**
**Virginia Skinner Jones**
**J. Malcolm Jones**
**W. E. Wild, Jr.**
**Dorothy Jean Hill Keenom**
**Shirley K. Bernstein**
**Mary Kathryn Meadors**
**George E. Meadors**
**Kathryn Wild**
**Axis Energy Corporation**
**Kenneth M. Waltrip**
**James Robert Hill**
**Virginia Glenn Hill Lattimore**
**Houston and Emma Hill, Trust Estate**
**John Newton**

**Carla F. Chrisco**
**Attorney at Law**
**610 Clarence Street**
**Lake Charles, LA 70601**
**(337) 433-0348**
**Counsel for Defendants/Appellees:**
**Elisabeth Johnson**
**C. Leslie Rice, Jr.**
**James Kemp, Estate of**
**Ralph R. Gilster, Jr.**
**Georgia Mauch**

**James Lawrence Bullen**
**Strain, Dennis, Mayhall & Bates, LLP**
**1018 Harding Street, Suite 104**
**Lafayette, LA 70503**
**(337) 237-5900**
**Counsel for Plaintiffs/Appellees:**
**Thomas C. McKowen, IV**
**Dorothy Lorene Wood**
**Charles I. Wood**
**Faithy W. Howard**
**Ruth R. Bravenac**
**John D. Williams**
**Barbara F. McGary**
**Nedra Pat Wood**
**Homer D. Wood**
**Roselle V. Manning**
**Diana Hundsoerfer Hauser**

**David Paul Bruchhaus**
**Mudd & Bruchhaus**
**P. O. Box 1510**
**Cameron, LA 70631**
**(337) 775-5063**
**Counsel for Defendants/Appellees:**
**Elizabeth Barlow**
**Neal Pratt Scott**
**Mitchell Investments**
**Martha Watts**
**Thomas Howes**
**Gail Moulton**
**Emmett Pratt, III**
**Henry Kravis, Trustee**

**Kyle Patrick Polozola**
**George Hardy Robinson**
**Liskow & Lewis**
**P. O. Box 52008**
**Lafayette, LA 70505**
**(337) 232-7424**
**Counsel for Defendant/Appellee:**
**JE & LE Mabee Foundation**

**Marion Gute Webb**
**In Proper Person**
**745 Via Lido Nord**
**Newport Beach, CA 92663**

**Tom Wahl**
**Oklahoma State Bank**
**P. O. Box 3499**
**Tulsa, OK 74101**
**Counsel for Defendant/Appellee:**
**Raymond F. Kravis, Trust**

**EZELL, JUDGE.**

Axis Energy Corporation and other interest owners in a mineral lease appeal a trial court judgment cancelling the mineral lease for failure to produce in paying quantities. Other issues raised by the Defendants concern bad faith, production proceeds, attorney fees, expert fees, and estoppel.

## FACTS

The facts are not in dispute. On May 17, 1951, William R. Ehni and Hugh W. Darling executed an oil, gas, and mineral lease (hereinafter the Ehni-Darling Mineral Lease) in favor of James E. Kemp. The lease covered 1,400 acres in Cameron Parish. The Plaintiffs are the successors to the lessors' interest in the lease.

Between 1951 and 1981, two wells were drilled on the property and three wells were drilled on the adjoining Doland Tract to the east, all of which produced for the Ehni-Darling Reservoir Wide Sand Unit. By January 1992, all of the wells had ceased to produce, except for the Doland No. 3 Well, which was the last well drilled.

On May 20, 1994, the Doland No. 3 Well loaded up with water and ceased to produce for the first time. Thereafter, a "stopcocking"[1] method was utilized to secure production of the well when it ceased to produce for the next several months. Eventually, the "stopcocking" was not successful, and in April 1995, the well was "swabbed." On April 20, 1995, the well ceased to produce and was shut in. The Plaintiffs' first written demand for release of the lease was made on June 7, 1995, due to failure to produce in paying quantities. The Defendants responded, denying that the lease had terminated. On July 19, 1995, another request was made by the Plaintiffs for cancellation of the lease.

---

[1]By "stopcocking" a well, the well is shut in to allow pressure to build up to a point where the well can sustain a flow of hydrocarbons.

During this time workover operations on the Doland No. 3 Well had commenced. The well was recompleted in a different unit sand and produced from the summer of 1995 until the fall of 1996.

On January 15, 1997, Plaintiffs made demand on the Defendants for further development and exploration of the lease or a release thereof. Subsequent demands were made on April 9, 1997, and May 22, 1997. Several parties released their interests in the lease. On October 8, 1997, the landowners/lessors filed suit against Axis and other parties claiming that the lease had terminated. The Plaintiffs asserted three bases for termination of the lease. They claimed that the lease terminated for failure to timely commence reworking operations as required by the lease, that there was failure to maintain production in paying quantities under the terms of the lease and Louisiana law, and finally, that there was failure to properly maintain the lease.

Trial before a judge was held on June 30, 2003, and July 1, 2003. The trial court found that the lease terminated for failure to produce in paying quantities as of April 21, 1995. The trial court found that the Defendants were liable to the Plaintiffs for any production revenue received, less the costs of production and the royalties and overriding royalties previously paid. The trial court also ordered the Defendants to render an accounting to the Plaintiffs for production revenue. The Plaintiffs were also awarded attorney fees in the amount of $62,000.00, in addition to expenses for prosecution of the matter in the amount of $9,179.62. The Defendants have appealed the judgment, and the Plaintiffs have answered the appeal.

## PRODUCTION IN PAYING QUANTITIES

The trial court found that for the accounting year May 1994 to April 1995, the Doland No. 3 Well had not produced in paying quantities. As a result, the trial court

2

found that the lease terminated no later than April 21, 1995. The Defendants claim that this finding was in error.

Louisiana Revised Statutes 31:124 requires production in paying quantities when a mineral lease is maintained by production of oil or gas:

> It is considered to be in paying quantities when production allocable to the total original right of the lessee to share in production under the lease is sufficient to induce a reasonably prudent operator to continue production in an effort to secure a return on his investment or to minimize any loss.

This court in *Lege v. Lea Exploration Co., Inc.*, 93-605, p.2 (La.App. 3 Cir. 2/2/94), 631 So.2d 716, 717, *writ denied*, 94-450 (La. 4/4/94), 635 So.2d 1112 (*quoting Clifton v. Koontz*, 160 Tex. 82, 325 S.W.2d 684, 691 (1959)) (alteration in original), discussed the process of determining whether there was production in paying quantities as follows:

> ". . . [T]he standard by which paying quantities is determined is whether or not under all the relevant circumstances a reasonably prudent operator would, for the purpose of making a profit and not merely for speculation, continue to operate a well in the manner in which the well in question was operated.
>
> "In determining paying quantities, in accordance with the above standard, the trial court necessarily must take into consideration all matters which would influence a reasonable and prudent operator. Some of the factors are: The depletion of the reservoir and the price for which the lessee is able to sell his produce, the relative profitableness of other wells in the area, the operating and marketing costs of the lease, his net profit, the lease provisions, a reasonable period of time under the circumstances,
>
> [and whether or not the lessee is holding the lease merely for speculative purposes.]
>
> "The term 'paying quantities' involves not only the amount of production, but also the ability to market the product. . . . Whether there is a reasonable basis for the expectation of profitable returns from the well is the test.

> If the quantity be sufficient to warrant use of the [product] . . . in the market, and the income therefrom is in excess of the actual marketing cost, and operating costs, the production satisfies the term 'in paying quantities.'"

A great deal of evidence and testimony was introduced at trial surrounding the history of the development of the Ehni-Darling Unit. The trial court obviously took this history into consideration as indicated by its following summary (footnote omitted):

> There had been five (5) wells completed in the Ehni-Darling ("E-D") Sand unit, but by 1992, only the Doland No. 3 was still producing any hydrocarbons. In all the other wells, water had risen in the formation to a point that gas could no longer be produced profitably. Three of the wells were plugged and abandoned. The fourth well in the E-D Sand unit to water out was the Doland No. 1-D well. Although the Doland No. 1-D was not plugged, it had no production since 1992 and only the Doland No. 3 was maintaining the subject lease. [The lease had no Pugh clause and only 77 acres of the 1400 acre tract was in the unit.] In 1993, the operator at that time, Occidental Energy Company, Inc. considered re-working the Doland No. 1-D but then withdrew the proposal. The explanation to the working interest owners by letter dated February 5, 1994, was that the costs were too high and "the Doland No. 3 well is rapidly declining."

> Because the Doland No. 3 well was the highest on the structure of the producing sand it was the last to experience the water problem but it was inevitable that it would eventually encounter the same difficulties that had closed down the other wells and that became manifest in 1994. On May 20, 1994, as was expected, the Doland No. 3 well loaded up with water and ceased to produce. From that date until its eventual shut-in on April 21, 1995, the operator had the pumper employ several techniques to regenerate production in the Doland No. 3. One method was that he would "stop cock" the well by shutting it in and allowing pressure to reach a certain point, then reopen the well, the effect of which was to enable the gas pressure to force the column of water out of the well bore. There were also swabbing and wireline operations, the first of which simply lifts the water out of the well bore column and the second which assures that the perforations are not blocked.

> On March 3, 1994, Gary Giles, who was the division land man for TGX Corporation, the contract operator, sent a letter to Ted Hoz and Associates, unitization specialist, as part of a plan to recomplete the Doland No. 3 well and unitize a sand at a lower level which was thought to have production potential. On August 16, 1994, TGX requested a

4

work permit from the office of Conservation to recomplete the Doland No. 3 well in the zones which were currently unitized and also in two lower formations which were not unitized. The firm of Leblanc Geological Inc. was hired to prepare a preapplication notice to the Commissioner of Conservation on the plan to unitize the lower sands.

Meanwhile, the working interest owners were becoming disgruntled with the marginal production of the well. In this regard, Mr. Ken [Waltrip] wrote to the manager of TGX on September 9, 1994:

> "You told me on the phone on June 2nd that swabbing the well was being not (sic) cost effective and that you would have an AFE to the owners within two to three weeks."

On September 14, 1994 Ken Cravens, division land man for TGX, replied to the [Waltrip] letter stating:

> "Our plans are to review the recompletion work subsequent to the title review and various commission matters required for same, but no later than year's end."

The end of the year came and the state of the matter was clearly summed up in a letter of January 27, 1995 from Mr. [Waltrip] to Ken Cravens, district land man for TGX Corporation. In it he says,

> "Currently this well (Doland No. 3) is not only <u>not</u> economical, salt water disposal is approximately double the monthly gross revenue, and other lease expenses have gone through the roof." *** "I could go on, Mr. Cravens, however, the point is, this well is losing money, this was predictable months ago, TGX has had ample time to complete its title study, and we still don't have a narrative proposal or an AFE for a recompletion attempt.

TGX's response, which is stamped "received on April 5, 1995", states,

> "Thank you for your letter of January 27, 1995 and the follow-up by fax dated March 30, 1995. My apologies for not addressing your letter sooner, however, in short TGX's plans to recomplete the subject well have been put on hold."

On May 5, 1995 Lindenmuth & Associates, Inc. wrote a letter to Forest Oil Corporation requesting a farm-out and stated that it has replaced TGX as operator of the wells. It also reads,

> "The Doland No. 3 is completed in the Ehni-Darling sand unit. The well has been producing excessive amounts of

water and is currently loaded up. TGX has swabbed the well several times but it will not stay unloaded. It appears that the current completion has watered out. The well was shut in on April 21, 1995 and has a sixty-day rework clause.

On May 31, 1995 O'Sullivan Oil and Gas Company, Inc. and Axis Energy purchased the interest of Lindenmuth & Associates effective May 1, 1995. Thereafter on June 2, 1995, O'Sullivan Oil & Gas wrote the working interest owners informing them that it had acquired the interest owned by Lindenmuth & Associates and proposed that emergency operations on an attached AFE be approved for operations to begin in the first or second week of June, 1995. It states therein:

> "The Doland No. 3 has been down since April 23, 1995 and the sixty-day rework/critical date is June 22, 1995. Since no unit has been approved for the deeper interval, we must obtain a unit prior to losing acreage to maximize our position."

On Friday, June 16, 1995, a rig was moved on the premises to begin a re-working operation on the Doland No. 3 well. This operation continued through July 6, 1995.

The trial court was presented with two different calculations pertaining to production in paying quantities; one from the Plaintiffs and one from the Defendants. While both calculations are based on a twelve-month time frame, each party's analysis is based on a different time period. Brian Groves, a petroleum geologist, testified on behalf of the Plaintiffs and looked at the period of July 1994 until June 1995. He explained that he went from depletion point back. Calvin Barnhill, a petroleum engineer, looked at how the well was behaving on an annual basis and used 1994 for his analysis. He also studied what was going on with the well itself. Another difference between the two calculations was the amount of operating expenses. In making his calculation, Groves included "producing well charges," "resource alternatives," and expenses attributed to the Doland No. 1-D well.

6

From July 1994 to June 1995, Groves determined that there was a loss of $21,290.44. Barnhill's calculations for the year 1994 show that there was a profit of $86,782.19.

In analyzing the production in paying quantities issue, it appears that the trial court used the calculations as determined by Groves. The Defendants claim that this was error because Groves lacked the engineering component that Barnhill used in making his calculations. However, the trial court used neither of the time frames as chosen by the parties, and instead chose to use the twelve-month period preceding the April 1995 shut-in of the Doland No. 3 Well. The trial court chose this time period because it was "broad enough to give an accurate picture of the well activity and also gives a true representation of the well's profitability vel non." Furthermore, as we previously stated, the only other real difference between the two calculations was some expenses that Groves included in his calculations, which were also included by the trial court.

The trial court chose to include the overhead expenses of the operator since the operator was a contract operator and not the actual lessee. We find that this decision by the trial court was correct. *See Menoah Petroleum, Inc. v. McKinney*, 545 So.2d 1216 (La.App. 2 Cir. 1989).

Additionally, the trial court chose to include the expenses of the Doland No. 1-D Well, observing that it continued to incur monthly expenses for the unit operator and "[t]he decision by the operator to keep Doland No. 1-D in that state was a business decision which has consequences." We also agree with the trial court's inclusion of this amount.

The trial court also chose to include the three amounts designated by Groves as "resource alternatives." Groves explained that he included these expenses because they were reoccurring expenses and he did not see any activity that would warrant a capital expense generation during that time period. The Defendants offered testimony that these were accounting fees and should not be included. Obviously, the trial court chose to believe that these were reoccurring expenses, and we cannot say this decision was manifest error.

In addition to evidence on income and expenses associated with this lease, the trial court heard testimony about the motivations that may have been driving each side in their actions leading up to the lawsuit. It is Plaintiffs' contention that the Defendants were speculating and attempting to hold on to the lease so that they could get the benefit of the 3D seismic survey that was eventually performed in the area in the spring of 1995. Groves explained that knowledge about the conduction of a seismic survey in the area was known in 1994. Gary Giles, who worked as a landman for TGX, assisted Axis in getting involved in the Ehni-Darling lease, and is a current owner of Axis, testified that Axis was waiting on seismic information between the time the well went down and 1997, when suit was filed.

On the other hand the Defendants point out that the Plaintiffs signed a "top lease" with William Bullen on November 2, 1994. The top lease acts as an option to lease the property should the lease in place terminate.

Defendants have argued that consideration was not given to the fact that good-faith efforts were taken toward achieving valued production in other unitized sands while economically testing a potentially productive lower sand. The trial court was presented with two different calculations with the only differences being the time

8

period and the addition of some expenses in one. Reviewing the evidence and the testimony as a whole, we cannot say the trial court's decision was clearly wrong. While the Defendants argue that their actions were reasonable and not speculative, the evidence is clear that this well was on a steep decline, with little hope of meaningful production for almost a year.

The trial court's twelve-month time period preceding the shut in of the Doland No. 3 Well, May 1994 - April 1995, produced a total net loss of $8,006.60. The trial court reasoned that the operator's actions in swabbing, flaring, and dropping soap sticks into the well when it ceased to produce in May 1994 were chosen "because they were inexpensive and would enable the well to limp along with just enough production to keep the lease alive . . . ." The trial court further concluded that "[t]he actions of the defendant never appeared to have the interests of the lessors in mind." We find no error in the trial court's decision that the lease came to an end no later than April 21, 1995, for failure to produce in paying quantities and affirm that decision.

### ESTOPPEL

The Defendants claim that the Plaintiffs should be estopped from making any claim with regard to prior lease maintenance because, from October 1997 through June 2002, Plaintiffs sought a judgment that the mineral lease should be judicially terminated for failure to develop or explore, admitting, therefore, that the lease had been maintained. The Defendants rely on the comments to La.R.S. 31:124 which provides, in pertinent part:

> A suit seeking damages or dissolution for nonperformance of the obligation of further development is inconsistent with one contending that the lease has terminated for failure to produce in paying quantities. The former must usually be preceded by a demand for performance, thus

9

admitting that the lease is still in force, whereas in the latter, performance is not what is desired by the lessor, his position being based on the contention that the lease has terminated automatically. Thus, the lessor claiming expiration has made a meaningful election.

In *Edmundson Brothers Partnership v. Montex Drilling Co.*, 98-1564 (La.App. 3 Cir. 5/5/99), 731 So.2d 1049, this court held that the lessors' demand for development based on inaccurate production information supplied to the state by the lessees did not estop the lessors from claiming the expiration of the oil and gas lease due to the lack of production. Similarly, in this case the Plaintiffs, in 1995, initially demanded release of the lease for failure to produce in paying quantities. Correspondence was returned to the Plaintiffs explaining that workover procedures were underway which would return the Doland No. 3 Well to production. Believing that these efforts were serious, the Plaintiffs later made a request for release of the lease for failure to develop the rest of the lease outside the area covered by the Doland No. 3 Well, still believing that good-faith efforts had been made to continue production. As previously discussed, these actions were obviously not a serious attempt to return the well to production, but rather were to enable the Defendants to maintain the lease in order to obtain the forthcoming seismic information.

Obviously, it was not until the Plaintiffs were able to investigate the records concerning the activities of the Doland No. 3 Well, that they realized that their initial demand for termination of the lease for failure to produce in paying quantities was a viable claim and they sought termination for failure to produce in paying quantities. Therefore, we find that Plaintiffs were not estopped from claiming that the lease terminated for failure to produce in paying quantities.

10

**BAD FAITH**

In its April 16, 2004 order, the trial court ruled that the date on which continued production under the lease was in bad faith was June 7, 1995. This is the day the Plaintiffs first made written demand on the Defendants for release of the lease for failure to produce in paying quantities. As a result, the judgment ordered that the working interest owners were responsible for production expenses following this date.

Louisiana Civil Code Article 488 provides that when products are reclaimed by the owner, a possessor in good faith is entitled to reimbursement for his expenses but a possessor in bad faith is not. A possessor ceases to be in good faith when defects in his ownership are made known to him or an action is instituted against him for recovery of the thing. La.Civ.Code art. 487.

The Defendants argue that they were never in bad faith, as they continued to make efforts to secure production. However, for the purposes of Articles 487 and 488, the term "bad faith" relates to the "right" to possess and notice of this right.

The June 7, 1995 letter was followed by other letters requesting release of the lease additionally stating that the lease had expired by its own terms and for further development and exploration, with the failure to do so resulting in termination of the lease. All of the parties, except for Axis and John Newton, released their interests in the lease that were outside the 11,000' E-D sand unit. Suit was then filed.

We recognize that both *Edmundson*, 731 So.2d 1049, and *Lamson Petroleum Corp. v. Hallwood Petroleum, Inc.*, 01-1201, 02-138 (La.App. 3 Cir. 12/31/02), 843 So.2d 424, held that defendants ceased to be in good faith when suit was filed. However, Article 487 does not restrict the timing of bad faith to the institution of suit,

but also provides that bad faith arises when the defects are made known to the possessor.

In *Corbello v. Iowa Production*, 02-826, p. 34 (La. 2/25/03), 850 So.2d 686, 709, the supreme court noted that at the expiration of its lease, "all rights of Shell as a lessor effectively ceased." The supreme court observed that Shell was not a bad faith possessor the entire time it occupied the premises after the lease expired due to continued negotiations with the plaintiffs; however, Shell did become a bad faith possessor at some point.

In this case the trial court found that the Defendants had knowledge of defects with their lease rights when the letter requesting termination of the lease was sent by the Plaintiffs. The Plaintiffs continued thereafter to demand release of the lease. We cannot say the trial court was clearly wrong in its finding that Defendants were in bad faith as of June 7, 1995.

## PRODUCTION PROCEEDS

The Defendants also allege that Plaintiffs' suit did not put in controversy the funds from production attributable to the leased lands. They argue that the only demand for damages was for failure to release the lease and that there was no demand for production proceeds.

The Plaintiffs have always alleged that the mineral lease terminated. Pursuant to La.R.S. 31:207, the former lessee of a mineral lease who fails to record an act evidencing extinction of its right is liable to the person in whose favor a lease is extinguished for all damages and attorney fees. Furthermore, a possessor in bad faith has to restore that which it has obtained from the land. La.Civ.Code art. 486.

12

The Plaintiffs alleged that the Defendants were no longer entitled to possess the land since the mineral lease had terminated, they gave notice to the Defendants, and they then filed suit against the Defendants asking for damages and attorney fees. Louisiana Code of Civil Procedure Article 862 provides that "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief."

A finding that the mineral lease terminated means that the Defendants had no rights to drill for oil and gas and were, therefore, responsible for the damages provided by the law, which includes production proceeds. *See Desormeaux v. Inexco Oil Co.*, 298 So.2d 897 (La.App. 3 Cir.), *writ refused*, 302 So.2d 37 (La.1974). It was not necessary for the Plaintiffs to specifically allege that Defendants owed them production proceeds. There was a request for damages due to termination of the lease and the failure of Defendants to release the lease.

## LOST LEASING OPPORTUNITY

In their answer to the appeal, Plaintiffs claim that they should have been awarded damages for lost leasing opportunities. This includes a claim for the $35,000.00 that Defendants received from Mobil Exploration and Production to conduct seismic exploration on the property.

In *Edmundson*, 731 So.2d 1049, this court affirmed a trial court's award for lost leasing opportunities. The trial court in *Edmundson* had found that more probably than not the plaintiffs would have negotiated a new lease, which was an attractive property for lease in 1988. Also, this court in *Chesapeake Operating, Inc. v. Richardson*, 04-345 (La.App. 3 Cir. 10/13/04), 884 So.2d 1263, held that the lessor

13

need only prove that it is more probable than not that he would have been able to lease his property had the lessee complied with its statutory duty to provide a timely release.

There is no doubt that the Plaintiffs herein had a top lease which provided they would receive $70,000.00 upon termination of the lease. As previously discussed and found by the trial court, it is apparent that the Defendants were conducting operations just to keep the lease alive. The motivation for these actions is to maintain the lease and thus have the available seismic data that was to be gathered in the future in this geological area. The Defendants granted permission to conduct the seismic survey on July 1, 1996. The seismic data was finally obtained in 1997. We find that the Plaintiffs established more probably than not that they would have had the opportunity to lease the property for $70,000.00 until at least the seismic information was obtained. Therefore, damages should have been awarded for lost leasing opportunities for those three years in the amount of $210,000.00. We also find that the amount of $35,000.00 should have been awarded to the Plaintiffs, which represents the amount the Defendants received from Mobil for the seismic exploration after the lease had terminated.

### ATTORNEY FEES

Another issue raised by the Defendants is that the Plaintiffs failed to comply with La.Code Civ.P. art. 861 which provides that items of special damages must be specifically alleged. The Defendants argue that the Plaintiffs never requested attorney fees for failure to grant a release of the "entire" lease, and, therefore, Plaintiffs are not entitled to attorney fees.

14

There is no doubt that the Plaintiffs demanded release of the lease outside the 11,000' sand unit. In their petition, Plaintiffs also demanded release of the entire lease, alleging that lease had terminated by its own terms. Plaintiffs then made a general request for attorney fees and damages under La.R.S. 31:206 for failure to timely provide a recordable act of release of the lease. We find that Defendants had specific notice that Plaintiffs were requesting attorney fees due to the failure to release the lease.

Defendants also claim that the attorney fees awarded by the trial court were excessive, while the Plaintiffs claim that the attorney fees awarded were insufficient. The amount awarded in attorney fees is left to the discretion of the trial court and should not be disturbed absent an abuse of that discretion. *See Corbello*, 850 So.2d 686, affirming a four million dollar award in attorney fees.

In *Rivet v. State of Louisiana, Dep't of Transp. and Dev.*, 96-145, pp. 11-12 (La. 9/5/96), 680 So.2d 1154, 1161, the supreme court set forth the factors to be considered in determining the reasonableness of attorney fees:

> (1) the ultimate result obtained; (2) the responsibility incurred; (3) the importance of the litigation; (4) the amount of money involved; (5) the extent and character of the work performed; (6) the legal knowledge, attainment, and skill of the attorneys; (7) the number of appearances involved; (8) the intricacies of the facts involved; (9) the diligence and skill of counsel; and (10) the court's own knowledge.

The trial court's ruling does not provide any guidance as to why it awarded the amounts of attorney fees that it did to the two law firms that represented the Plaintiffs. Regarding the award of attorney fees to the law firm of Ottinger, Hebert & Sikes, it is clear the trial court failed to realize that there were two summaries of services rendered attached together. There is no doubt that the trial court intended to award

15

both firms the total amount of expenses incurred. The trial court awarded the exact amount of total expenses listed on the billing summary for Strain, Dennis & Bates but only awarded the exact amount of expenses listed on the last billing summary for April 24, 2000, in the amount of $360.70, in the attachment submitted on behalf of Ottinger, Hebert & Sikes. The amount of attorney fees listed on the last page for Ottinger, Hebert & Sikes was $2,218.75, with the trial court awarding $2,000.00. However, there was another billing record representing work done as of February 18, 1998, indicating attorney fees in the amount of $15,506.25, and expenses of $742.28.[2]

Apparently, the trial court failed to recognize that there was another billing summary in the attachment, and we find that Ottinger, Hebert & Sikes is entitled to an increase in attorney fees. We find that the award of attorney fees for work performed by Ottinger, Hebert & Sikes should be increased by $15,506.25 as we do not find a total award of $17,506.25 to be an unreasonable attorney fee for work performed on behalf of Plaintiffs from 1997 through 1999, which included keeping up to date on the workings of the lease and the pertinent law, continually requesting release of the lease, numerous conference matters with different parties, and the handling of the initial filing of the action.

The law firm of Strain, Dennis & Bates submitted billing records indicating expenses totaling $8,818.92, which was awarded by the trial court. The same submission indicates total attorney fees incurred were $129,498.75, but the trial court only awarded $60,000.00, while awarding the full amount of expenses. According to the billing records, the firm logged over 760 hours since 2001. Reviewing the trial testimony and evidence submitted, it is obvious that the attorneys worked diligently

---

[2] We note there was no request for an increase in the expenses awarded.

on investigating and preparing this complicated case for trial. The record demonstrates the sound quality of legal services provided on behalf of the Plaintiffs, the thoroughness of the attorneys' preparation, and the good outcome obtained through the attorneys' efforts. We find that the amount awarded on behalf of the work performed by Strain, Dennis & Bates to be abusively low when the time and expertise involved to produce a favorable outcome for the Plaintiffs is considered. Accordingly, the award of attorney fees is amended to $95,000.00. Also, as requested by Plaintiffs, we award an additional $2,500.00 for work performed on appeal.

### EXPERT WITNESS FEES

The Plaintiffs also ask this court to increase the amount of expert witness fees awarded for Bryan Groves' services. Plaintiffs introduced evidence of charges for Groves' services in the amount of $22,925.00, but the trial court only awarded $7,000.00.

Louisiana Revised Statutes 13:3666 provides for the assessment of expert witness fees. "The trial court has great discretion in awarding costs including expert witness fees, which will not be reversed on appeal in the absence of an abuse of discretion." *Allstate Ins. Co. v. Ford Motor Co.*, 00-710, p.11 (La.App. 3 Cir. 11/2/00), 772 So.2d 339, 346.

The trial court did use the calculations made by Groves in determining whether there was production in paying quantities for the twelve-month period it decided to examine. However, this was the first time that Groves had testified as an expert in any court. Furthermore, a review of his detailed bill indicates that many of his charges were for review of the bench book introduced into evidence. We find that the amount awarded was not an abuse of the trial court's discretion.

17

For the above reasons, the judgment of the trial court finding that the lease terminated is affirmed. The judgment is amended to include an award of damages for lost leasing opportunities to the Plaintiffs in the amount $245,000.00. The judgment is also amended to increase the amount of attorney fees awarded for the work of Ottinger, Hebert & Sikes to $17,506.25 and to increase the amount of attorney fees awarded for the work of Strain, Dennis & Bates to $95,000.00. The judgment is also amended to award $2,500.00 in attorney fees for appellate work. In all other respects the judgment is affirmed.

**AFFIRMED AS AMENDED.**